S. CARL MANTELL and MILTON ADLER, jointly and severally
trading as LIBERTY NATIONAL DISTRIBUTORS, complain-
ants-respondents,

*v.*

INTERNATIONAL PLASTIC HARMONICA CORPORATION, defend-
ant-appellant, and PETER CHRISTIAN CHRISTENSEN and
FINN H. MAGNUS, appellants.

[Argued February 7th, 1947.   Decided October 21st, 1947.]

380

*Mr. John E. Toolan (Mr. Thomas J. Brogan* and *Mr. Meyer E. Ruback,* of counsel), for the appellants.

*Mr. Arthur T. Vanderbilt,* for the respondents.

The opinion of the court was delivered by

HEHER, J.

There are two appeals here. One is directed to an adjudication of civil contempt against the defendant corporation

and Christensen, its president, and Magnus, its vice-president, made on September 5th, 1946, for having sold patented plastic harmonicas manufactured by the corporation to persons other than complainants, and also engaging in competition with complainants in certain areas, all in violation of a preliminary injunction granted the prior December 7th; the other challenges a decree made on the same day, after final hearing, enjoining the corporation, *inter alia,* (1) from selling such harmonicas to persons other than complainants until it had supplied complainants with specified minimal quantities "from the harmonicas" produced "up to July 3d, 1947," in accordance with what was found to be the corporation's contractual obligation, and (2) from engaging in competition with complainants in the regional area allotted to them by the contract, and directing a reference to a master to ascertain "the extent of the injury and damage" suffered by complainants and "of the profits" made by the corporation "by reason of said acts in violation of the contract, * * * for the period from July 1st, 1945, through December 6th, 1945," only, since the original restraint was imposed on December 7th, 1945, and the corporation had been adjudged in contempt for disobedience of the order, and there had been a reference to a master to fix the amount of a fine to be paid to complainants, "measured by this injury suffered" by them. The decree further directed that in determining complainants' damage and the corporation's profit, the master "be guided by the findings of fact" set forth therein; and that he report (a) the profits which complainants have lost because of the breach of the contract found by the Vice-Chancellor, and (b) the profits made by the corporation as a result of its breach of the contract, to the end that a "fine" may be imposed "for the use" of complainants, "measured" by either computation "as the court may by order direct." In making computation (a), the master was instructed that "the sale of 83,678 harmonicas made by defendant to complainants on January 23d, 1946, after a period of approximately five months without any deliveries, was not a sale in the usual course of business but was made in bad faith in an attempt to embarrass complainants, and to induce a breach of contract

to facilitate the lifting of the restraining order, and the immediate resale of said harmonicas by complainants was in the nature of a forced sale not reflecting normal profits." Thus, the decree is in substance a final disposition of the basic issues.

The adjudication in contempt also directs a reference to the same master to compute the "profits" lost by complainants and the "profits" made by defendant by reason of the violation of the preliminary injunction, subject to specific findings and instructions embodied therein, and levies upon the corporate defendant and its named officers, for the use of complainants, a "fine" equal to the "injury and damage" sustained by complainants or the "profits" made by the corporation by reason of the disobedience of the injunction, "as the court may by order direct." A jail commitment is the alternative to noncompliance. And there is also a provision for sequestration in such event.

On October 10th, 1946, an order was entered at the instance of the defendant corporation, with complainants' consent, terminating "all restraints" imposed by the decree under appeal, "from this day forward but not heretofore," and providing that the decree "shall in all other respects continue in full force and effect." The order recites that on September 19th, 1946, defendant tendered to complainants delivery of 210,000 harmonicas for the then current month; that the tender was refused; and that complainants had "declared it to be their purpose and intention to accept * * * no further deliveries of harmonicas at any time in the future," on the ground that defendant, in their view, had "completely and irrevocably broken" the contract.

I.

The first insistence is that, for want of a stipulation fixing the sale price of the goods constituting the subject-matter of the bargain, no contract enforceable either at law or in equity came into being.

The agreement was made in writing on July 3d, 1945, for a term of two years from that date, automatically renewable

for like periods until terminated by notice given by either party to the other. Thereby, the defendant corporation "appointed" complainants as its "general distributors" of plastic harmonics to be manufactured by it under letters patent "throughout the State of New York, excepting therefrom the City of New York and all its Boroughs, the states of Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia," save "all sales" in that regional area "to chain department stores, mail order houses, sales to the export trade, to the American Red Cross, and P. X. stores in the United States Army and Navy camps." And it was provided that the corporation "shall deliver to the distributors, and the latter shall take, during every month, beginning with July, 1945, all of the harmonicas produced" by it, but not exceeding 30,000 per month, "at the lowest prices and with the highest discount which" it "shall give to any other distributor in the United States of America;" and that "The initial retail list prices for said harmonicas shall be $1.00 for each black harmonica, $1.15 for each harmonica in solid colors, and $1.25 for each harmonica in mottled colors." It was also agreed that when the corporation "obtains another injection moulding machine and other necessary equipment," it "shall deliver to the distributor and the distributors shall take * * *, an additional 45,000 harmonicas per month, and an additional 45,000 harmonicas per month for each additional machine not exceeding four machines." The agreement recites a representation by complainants to "use their best efforts, skill and facilities to introduce, advertise and promote the sale" of the harmonicas, and their "desire to act as general distributors" thereof; and it was stipulated that complainants, as such distributors, "shall cover their assigned territory with proper representatives, traveling agents, correspondents and other sales methods to increase the sales" of the product, and to "co-operate with the producer in formulating sales promotion plans and in supplying statistical information from time to time whenever so requested." It was also provided that the "contract shall bind and enure to the benefit of the parties" and "their respective heirs, executors, successors and assigns."

Complainants were the only "distributors" appointed by the defendant corporation; and the contention is that the "price element" was, by common consent, "committed to the future event of the appointment of other distributors and the giving by the manufacturer of prices to such other distributors," and, failing such appointment, the standard thus prescribed would not "spring into existence" and the "price would remain unfixed," and so the agreement would be unenforceable for indefiniteness and want of mutuality. Appellants seemingly concede that if the agreement were utterly silent on the subject of price, the standard of "reasonable or market value" would prevail, and reference could then be had to the differentials commonly obtaining in the open market as between distributors and jobbers and subordinate dealers.

But the agreement did not fix either the price of the goods or a standard for the admeasurement of the price. Indeed, appellants frankly concede that when the agreement was made, "it was not practical to fix a free price," since the plastic harmonica "had not yet been perfected" and the "manufacturer's production capacity was altogether speculative and unknown." This type of harmonica was a radical innovation and its potentialities were uncertain; and production and sales experience necessarily entered into the setting of prices. The stipulation that the sale prices should not exceed those given to "any other distributor" obviously was designed to safeguard complainants against price discrimination and inequality that would materially impair or, perhaps, destroy the value of the contract. It was not in contemplation that the very existence of the contract would depend upon the appointment of another distributor and a price agreement with the appointee. Appellants acknowledge that complainants "wanted to be certain that their price would be no higher than that given to the defendant's other distributors;" and it is said that, while the defendant corporation's original plan was to appoint seven distributors throughout the country, and to sell and distribute the product only through them, the appointment of another distributor "was never made because the business expediency of the defendant did not

require it," and defendant was the "sole judge" of "the wisdom of the policy of making such appointment" and it was under no duty to designate other distributors "solely for the purpose of creating a price standard to serve the complainants." That interpretation would be utterly illogical and unreasonable and in plain disregard of the written manifestation of assent.

Performance of the mutual obligations undertaken was not to be deferred until another distributor was designated. The very terms of the writing are conclusive of that proposition. The agreement was immediately effective. There were peremptory correlative obligations of purchase and sale from the outset. Defendant was bound to deliver, and complainants obliged to accept, the entire product up to the specified *maxima* "during every month, beginning with July, 1945." The retail prices were listed. And all shipments were to be "made either cash on delivery or with sight draft attached to a bill of lading." And complainants were also under the immediate duty of performance of their sales promotion and marketing stipulations. Indeed, the defendant corporation's admitted repudiation of the contract was predicated upon complainant's asserted nonperformance of this undertaking; and this is likewise its insistence here. To hold that the agreement could not give rise to contractual obligations until another distributor was appointed and prices given the appointee would be to ignore terms clearly importing immediate and absolute obligation—a distortion of the normal usage of the words employed to express the common intention. There were mutual undertakings that were not made to depend upon the defendant's view of the "business expediency" or the "wisdom of the policy" of designating other distributors, as opposed to other methods of sale and distribution.

The general purpose of the agreement is to be considered in ascertaining the sense of particular terms. The design of the parties to a written contract is to be collected from the instrument as an entirety. And the writing is to have a reasonable construction. Disproportionate emphasis upon a single provision does not serve the purpose of interpretation. Words, phrases and clauses are not to be isolated but related

to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intention. The literal sense of the terms may be qualified by the context. The significance of a particular part of the writing is determined by a consideration of all its parts. It is the revealed intention that is to be effectuated. In a word, the standard of interpretation is the meaning that would be attached to the integration by a reasonably intelligent person. And, in the quest for the common design, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain, are to be regarded. *Monmouth Park Association* v. *Wallis Iron Works, 55 N. J. Law 132; Corn Exchange National Bank and Trust Co.* v. *Taubel, 113 N. J. Law 607; Bullowa* v. *Thermoid Co., 114 N. J. Law 205; Cameron* v. *International Alliance, 119 N. J. Eq. 577.*

The price of the goods was not a matter for the sole determination of the producer, nor was it reserved for the future agreement of the parties, although there is authority for the view that this, also, is in substance a provision for a reasonable price. Because of the exigencies of the particular situation, the parties were deliberately silent as to price; and thus they imported into their contract the standard of reasonableness which the law implies in a contract mute as to price and providing no mode or standard for the fixation of the price. *R. S. 46:30–15.* "By proper construction, it is a stipulation for a reasonable price * * *." *Burlington Grocery Co.* v. *Lines, 96 Vt. 405; 120 Atl. Rep. 169.* It is an agreement implied in fact. *Feigenspan* v. *Nizolek, 71 N. J. Eq. 382;* affirmed, *72 N. J. Eq. 949; Williston on Contracts (rev. ed.)* § *41.* The parties are presumed to have contracted with reference to the existing law; and thus the implication is one of fact based upon a presumptive intention. This would, of necessity, include a reasonable price differential as between the complainant distributors and subordinate dealers. The parties plainly had a turn-over profit in view. And the established initial retail price list, and the prices at which sales were made by defendant to jobbers and other dealers, would constitute elements entering into the determination of a price fair and reasonable under all the circum-

stances. The inquiry also involves the cost and *quantum* of production, sales appeal, market conditions, competition, trade customs and usages, and other pertinent factors.

But the stipulation itself suggests a fair and reasonable price standard, applied as the circumstances became known and were evaluated. If it be deemed a mode for ascertaining the price, it is a matter of form rather than of substance, subsidiary and incidental to the principal purpose of the agreement, and treated virtually as a promise to sell for a fair price, and the contract effectuated accordingly. Where the conventional standard is nonessential, and is rendered abortive, equity will by some appropriate method determine what is a fair and reasonable price under all the circumstances. *Lehigh Valley Railroad Co.* v. *Andrus, 91 N. J. Eq. 225;* affirmed, *92 N. J. Eq. 238; Goerke Kirch Co.* v. *Goerke Kirch Holding Co., 118 N. J. Eq. 1; Joy* v. *City of St. Louis, 138 U. S. 1; 11 S. Ct. 243; 34 L. Ed. 843; Pomeroy's Specific Performance of Contracts (3d ed.), § 151.*

The agreement here is not purely one for the sale and purchase of goods. Complainants were allotted an exclusive distributorship in the defined regional area. The exclusive grant is implicit in the nature and terms and conditions of the agreement. If such was not the common intention, there would have been no need for the specific exclusion of the City of New York from the territory assigned to complainants, or of the enumerated trade outlets from the market area. And the provision for the delivery to complainants of the defendant corporation's full production of the commodity up to the specified *maxima* of necessity connotes an agreement by the corporation not to sell to others that which it had agreed to sell to complainants. A promise which is affirmative both in form and substance may include, by necessary implication, an agreement not to do anything inconsistent therewith. The affirmative may imply or include a negative. *Williston on Contracts (rev. ed.)* § *1448.* And there was a practical construction of the contract by the parties in keeping with the fact of an exclusive distributorship. In its answer in lieu of plea, the defendant corporation admitted, and the admission was also supported by the proofs, that prior to October

1st, 1945, it mailed to complainants "all prospective purchase inquiries" received by it from persons "in complainants' territory to whom defendant was not entitled under said contract to make sales."

This type of contract is a comparatively recent device to meet modern needs in the marketing and distribution of goods on a nation-wide or regional scale. In the very nature of the exclusive sales and distribution contract, it is not usually practicable to fix prices and the *quantum* of goods sold; and the rules of certainty and definiteness which govern the ordinary contract of sale have no application. Unlike a pure contract of purchase and sale, agreements of this class embody mutual promises and obligations with sufficiently definite standards by which performance can be tested. The grant of the exclusive franchise is a consideration for the grantee's obligation to establish and develop a market for the sale and distribution of the product in the area covered by the monopoly. The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices. This is especially so where, as here, the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities. Such contracts have the requisite mutual assent and consideration. They are not comparable to the ordinary executory agreement to buy and sell goods. *Bendix Home Appliances, Inc.,* v. *Radio Accessories Co., 129 Fed. Rep. (2d) 177; Jay Dreher Corp. v. Delco Appliance Corp., 93 Fed. Rep. (2d) 275; Ken-Rad Corp.* v. *R. C. Bohannan, Inc., 80 Fed. Rep. (2d) 251; Marrinan Medical Supply* v. *Ft. Dodge Serum Co., 47 Fed. Rep. (2d) 458; Schnerb* v. *Caterpillar Tractor Co., 43 Fed. Rep. (2d) 920; Moon Motor Car Company of New York* v. *Moon Motor Car Co., Inc., 29 Fed. Rep. (2d) 3; Williston on Contracts (rev. ed.),* § 1027-A.

Contracts of this category are to be given a practical interpretation that will effectuate and not defeat the common intention in an area of conventional action that, due to unpredictable market conditions, production factors, and so on, ordinarily does not permit of greater certainty and definiteness in the particulars mentioned.

## II.

We come now to the point of jurisdiction.

It is said that the aim of the bill "was to compel the delivery of chattels," and there cannot be compulsory specific performance of an agreement for the sale of personal property, save where the subject-matter has some special or peculiar value or is of an unique character; that the nondelivery of the commodity bargained for simply deprived complainants of the contemplated resale turn-over profit, readily measurable and recoverable by common-law processes, and thus there is an adequate remedy at law; and that, in any event, complainants' refusal to accept the tender of the product made in September, 1946, and their decision to regard the contract as irrevocably broken and to accept no further deliveries, followed by the lifting, with their consent, of the permanent restraint against sales of the goods to others, constituted an abandonment "of the specific performance" which was "the major relief sought by the bill," and "the abandonment of the major relief carried with it a surrender of the incidental and ancillary relief, that of damages." In a word, it is said that the cause "should not be retained for a single purpose which in and of itself furnishes no basis for the exercise of equity's jurisdiction."

The object of the bill was not a mandatory decree for specific performance, but rather the enforcement of an implied negative stipulation not to sell the commodity to others, or what may well be termed a negative specific enforcement of the contract; and the decree is so confined. And the test of this jurisdiction is the inadequacy of the legal remedy of damages. Is the legal remedy certain, complete and sufficient? To exclude equitable jurisdiction, the legal remedy must be as efficient as the remedy which equity affords under the same circumstances. *Pomeroy's Equity Jurisprudence* (*5th ed.*), § 180.

This was an appropriate case for negative restraint as an indirect means of enforcement of the contract. The contract granted to complainants an exclusive franchise to vend in the assigned field a new harmonica of radically different de-

sign and composition to be manufactured under letters patent controlled by the defendant corporation, and there was an entirely reasonable prospect of a profitable yield if there were deliveries of the product in keeping with the contract, and thus the franchise was a valuable property right entitled to protection by equitable process if the remedy at law was inadequate. It was not, as we have seen, an ordinary contract of sale. Complainants had undertaken performance of the contract; and thereby there came into being the nucleus of a market and good will and the foundation of a lawful business monopoly that would have yielded a substantial return if the promised articles of commerce had been made available. The law does not afford a certain, complete and sufficient remedy in such circumstances. The commodity was not procurable elsewhere; and thus the development of the market and the successful operation of the business depended upon performance by the manufacturer. Nonperformance made for irreparable injury. It would have been well nigh impossible to ascertain the full damages ensuing from the breach of the contract. And an established business of this nature would in all human likelihood have been convertible to other profitable kindred uses even after the particular agreement had been terminated. And the provision of the goods was an indispensable requisite to the establishment and development of the business.

Wherever the contract is of the class which is ordinarily specifically enforceable, equity will restrain its breach by injunction, if that is the only practical mode of enforcement permissible by its terms. But the injunctive remedy is not confined to stipulations negative in form; it ofttimes extends to those affirmative in character, where the affirmative stipulation implies or includes a negative. *Pomeroy's Equity Jurisprudence (5th ed.)*, §§ 1341-1344. And where the contract requires the doing of some personal act calling for special skill or artistry, such as singing in a concert hall and not elsewhere, or where in the particular circumstances a decree of specific performance would not be enforceable or practicable because of the need for continuing superintendency of the manufacturing process, equity will enforce the negative

stipulation by the injunctive remedy if thereby substantial justice will be done between the parties. This general principle of equity jurisprudence has been liberally applied in this state in analogous cases. *Manhattan Manufacturing Co.* v. *New Jersey Stock Yard Co., 23 N. J. Eq. 161; Myers* v. *Steel Machine Co., 67 N. J. Eq. 300;* affirmed, *68 N. J. Eq. 795; Feigenspan* v. *Nizolek, supra; Mausert* v. *Feigenspan, 68 N. J. Eq. 671; Curlice Brothers' Co.* v. *Catts, 72 N. J. Eq. 831; Atlantic Refining Co.* v. *Kelly, 107 N. J. Eq. 27.* See, also, *Singer-Sewing Machine Co.* v. *Union Button-Hole and Embroidery Co., 22 Fed. Cas. No. 12,904; Husting Co.* v. *Coca Cola Co., 205 Wis. 356; 237 N. W. Rep. 85; 84 A. L. R. 22,* certiorari denied, *285 U. S. 538; 52 S. Ct. 311; 76 L. Ed. 931; Lumley* v. *Wagner, 1 DeG., M. & G. 604, Errington* v. *Aynesly, 2 Bro. Ch. Cas. 343.*

Defendant invokes the doctrine that specific performance cannot be had unless there is mutuality of remedy.

But this is not a decree for specific performance. The negative remedy of injunction was allowed to restrain the defendant manufacturer from selling to others products which it had agreed to sell to complainants, and from competing with complainants in the territory exclusively assigned to them, and thus to lose the benefit of the breach; and, if the cited principle is applicable at all, there was mutuality of obligation and remedy here, for complainants were under the reciprocal duty of refraining from competition with defendant in the defined area and the latter would have had the like remedy in the event of a breach of the duty. The cited cases in this state are dispositive of this proposition. *Myers* v. *Steel Machine Co., supra; Feigenspan* v. *Nizolek, supra; Mausert* v. *Feigenspan, supra; Atlantic Refining Co.* v. *Kelly, supra.* This negative remedy is peculiarly appropriate where affirmative specific performance is not enforceable or is impracticable. And complainants' continuing obligation of performance of all stipulations, in the event of performance by defendant, was implicit in the provisions of both the order and the decree. The modern view distinguishes between mutuality of obligation and remedy; and the tendency is not to

deny specific performance simply because it is not available to the other party. *A. L. I. Contracts, § 372.*

And Chancery has jurisdiction to assess the damages attributable to the defendant manufacturer's breach of the contract. It is the settled rule that where equity has rightfully assumed jurisdiction over a cause for any purpose, it may ordinarily retain the cause for all purposes, and proceed to a final determination of the entire controversy, and establish purely legal rights and grant legal remedies. *Middlesex Concrete P. & E. Co.* v. *Northern States Improvement Co., 129 N. J. Eq. 314; Pomeroy's Equity Jurisprudence (5th ed.), §§ 181, 231-242.* In the view we have taken of the case, there is no occasion to determine under what circumstances discovery itself is deemed an independent source or foundation of the equitable jurisdiction to adjudicate upon matters and to grant reliefs which are otherwise purely legal. *Vide Capraro* v. *Propati, 127 N. J. Eq. 419; Pomeroy's Equity Jurisprudence (5th ed.), §§ 223 et seq.*

Complainants' abandonment of their right to the enforcement of the implied negative stipulation, and the vacation of the permanent restraint in this regard, did not serve to deprive Chancery of jurisdiction to assess and decree the payment of compensatory damages for the breach of the contract.

Ordinarily, the jurisdiction of equity is tested by the facts existing at the inception of the suit; and if the complainant is then entitled to equitable relief, equity's jurisdiction to settle all the issues, even though purely legal in nature, and to award damages for the breach of a legal right involved in the suit, will not be defeated by subsequent events which render equitable relief impracticable or unnecessary or unsuitable. *Rooney* v. *Weeks, 290 Mass. 18; 194 N. E. Rep 666; Ricaby* v. *McCrory Stores Corp., 35 Fed. Rep. (2d) 14. Pomeroy's Equity Jurisprudence (5th ed.), § 237 e; 30 C. J. S. 419, 430; 19 Am. Jur. 132.* This must necessarily be so, for the rationale of the rule that an equitable feature draws the cause completely within the cognizance of equity is the policy of avoiding "a multiplicity of suits." *Pomeroy's Equity Jurisprudence (5th ed.), §§ 181, 243.* For a more

extended application of the rule, see cases cited in *Butting-hausen* v. *Rappeport, 131 N. J. Eq. 252.*

Complainants' good faith in invoking equitable jurisdiction is not open to doubt. The ground asserted was not a mere colorable disguise for the purpose of evading the legal forum. The altered circumstances, occasioned by the defendant corporation's continued breach of the contract, was justification enough for the abandonment of the equitable remedy sought *in limine.*

We concur in the conclusion of the learned Vice-Chancellor that the defendant failed in the performance of its contractual obligations, and that complainants were not in default in the observance of those laid upon them. And we find no merit in the contention that the preliminary injunction was not willfully contemned by defendant or its named officers, either in fact or in law. There is no need to elaborate upon the Vice-Chancellor's reasoning in this regard.

### III.

The remaining points worthy of specific mention relate to the *quantum* of the fine leviable under the contempt adjudication, and the measure of damages for defendant's breach of the contract.

No fine has yet been levied, nor have the damages been assessed; and we therefore have no occasion to consider the questions now raised and argued. There is a direction merely to compute both damages and profits, for possible use in the alternative. The measure of both the fine and the damages and the assessments are reserved for future determination; and the disposition of the points made may well await that event. We shall not disturb the directions to the master in this behalf; but we intimate no opinion as to whether the circumstances of the case in hand warrant a deviation from the rule applied in *Weiss* v. *Revenue Building and Loan Association, 116 N. J. Law 208,* and *Marcus & Co., Inc.,* v. *K. I. G. Baking Co., Inc., 122 N. J. Law 202.* We have not considered the question.

The decree speaks of a "fine" to be imposed upon defendant, for the use of complainants, measured by either of the computations which the master was directed to make. It is conceded that here the use of the term "fine" was inadvertent, and that the thing in contemplation was "the usual award of damages for past violations of a contract where a permanent restraint is imposed." The provision is in error; and it is modified accordingly.

Save as modified, and with the stated reservations, the adjudication in contempt and the decree are affirmed; and the cause is remanded for further proceedings not inconsistent with this opinion.

*For modification*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, COLIE, WACHENFELD, EASTWOOD, WELLS, DILL, FREUND, McLEAN, JJ. 11.

*For modification not on opinion*—McGEEHAN, J. 1.