[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 410 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 411 
This is an action by 220 tenants against their landlord to restrain the latter from enforcing its demand for a uniform $5 increase in the monthly rent, payable by each plaintiff under his respective lease with the defendant, and to restrain the defendant from re-entering and resuming possession, by summary proceedings or otherwise, of the respective premises demised to the plaintiffs. Plaintiffs further seek a construction of their leases and a declaratory judgment determining whether or not the defendant-lessor has *Page 412 
the right to increase the rentals and whether the plaintiffs are obliged to pay such rental increases.
The cause is submitted for a decision on a written stipulation of facts and upon such allegations in the plaintiffs' complaint as are admitted by the defendant's answer. The admitted facts are:
In the spring of 1947 the defendant company was engaged in completing a large garden apartment project known as "Stuyvesant Town" and located in Union Township, in this State. The project consisted of many buildings and many hundreds of apartments. Some of the apartments consisted of 3 1/2 rooms and others of 4 1/2 rooms. Some of the buildings were completed in May and June of 1947 and others in later months. The erection of the project was aided with mortgage funds guaranteed or insured by the Federal Housing Administration and, as charged in the complaint and admitted in the answer, preference and priority of opportunity of occupancy was to be given to veterans of World War II and their immediate families, and "said Federal Housing Administration also fixed limitation on rents to be charged." The rents initially approved by the Federal Housing Administration were a monthly rental of $73 for each 3 1/2 room unit or apartment and a monthly rental of $85 for each 4 1/2 room unit or apartment. Those are the rentals which uniformly are stated in the respective leases held by the plaintiffs, the only variance in rental being the differential betwen the larger and the smaller apartments.
In view of the controversy, it is important to classify the 220 tenants according to the time their leases went into effect. The parties themselves made such classification in their stipulation of facts filed herein. Those classes are three in number and are as follows:
Class I: 37 leases held by 37 tenants, each of which leases was executed prior to July 1, 1947.
Class II: 31 leases held by 31 tenants, each of which leases was dated prior to July 1, 1947, but was executed subsequent to July 1, 1947, and possession thereunder taken subsequent to that date.
Class III: 152 leases held by 152 tenants, each of which leases was dated and executed after July 1, 1947. *Page 413 
The leases of all plaintiffs are identical in form, varying only in respect of date, name of tenant, identification of apartment, and stipulated rental. Each lease is for a term of five years. Attached to the stipulation of facts are schedules furnishing the names and details of the three groups of tenants.
It is admitted that all of the plaintiffs are either veterans of World War II or that members of their immediate families are such.
The entire controversy between these parties springs from paragraph 5, which paragraph is present in the lease of each plaintiff. It reads as follows:
"5. If and when rents of housing accommodations, including the demised premises, may be lawfully increased, then and in that event, Landlord shall have the right and privilege, anything contained in the within lease to the contrary notwithstanding, to increase the rent of the demised premises for the unexpired term of this lease as it may in its sole discretion desire, in which case Tenant shall have the right and privilege to cancel the within lease and remove from the demised premises within 90 (ninety) days after the first day of the month following the demand for any increase in rent. Said increase shall be effected by a demand in writing addressed to Tenant and mailed by ordinary mail to Tenant at demised premises, and from and after the date of said mailing the increased rent shall be the rent reserved under this lease for the balance of said term."
Plaintiffs in their brief point out those Administrative Rules and Regulations for Rental Housing Insurance Under Section 608 of the National Housing Act (as amended May 22, 1946), which regulate the subject of rent increases in such projects. This the defendant admits. It therefore appears that in connection with the mortgage loan transaction achieved by means of an FHA mortgage on the project here involved, the defendant entered into a written agreement with the Federal Housing Administration in which it agreed as follows:
"(a) No charge shall be made by the mortgagor for the accommodations offered by the project in excess of a rental schedule to be filed with the Commissioner and approved by him or his duly constituted representative prior to the opening of the project for rental, which schedule shall be based upon a maximum average rental fixed prior *Page 414 
to the insurance of the mortgage, and shall not thereafter bechanged except upon application of the mortgagor to, and thewritten approval of the change by, the Commissioner. (Italics supplied.)
"(b) The established maximum rental shall be the maximum authorized charge against any tenant for the accommodations offered and shall include all services except telephone, gas, electric, and refrigeration facilities. Charges permitted in addition to such maximum rental shall be subject to the approval of the Commissioner.
"(c) The regulation and restriction provided for in the above paragraphs (a) and (b) of this subsection shall not apply so long as the maximum rents are regulated by another agency of the United States Government. Such maximum rental as established by such agency of the United States will be accepted by the Commissioner as an approved rent schedule. Upon the expiration of the authority of any such agency to fix maximum rentals, the established maximum rental schedule then in force with respect to the project shall be the established maximum rental schedule within the provisions of (a) and (b) above, and shall not thereafter be changed except upon approval of the Commissioner."
At some time prior to March 1, 1948, the defendant applied to the Federal Housing Administration for leave to increase the monthly rentals in all the apartments of the building project, they being about 700 in number. The defendant's application was supported by a showing of increased cost of construction of the project, plus increased costs of operation and maintenance, plus increase in municipal taxes. On March 1, 1948, the New Jersey District Director of the Federal Housing Administration issued his written approval of a uniform $5 increase in the rental of each apartment. The same day a written notice of such approved increase was mailed to each plaintiff. A copy of that notice is attached to the complaint. It states that due to the greatly increased construction costs of the project the Federal Housing Administration has authorized a $5 increase.
At the same time that this project was by force of the agreement with the Federal Housing Administration subjected to maximum rent control, it also could be brought under the control of the United States Office of the Housing Expediter who, under legislation then in effect and regulations promulgated thereunder, had the authority upon application to adjust housing rents and either to allow increases or order reductions. In May of 1948 the defendant applied *Page 415 
to the Office of the Housing Expediter for specific approval of the $5 increase in the case of each tenant in Class I and Class II, above mentioned. Such specific approval was given in writing on June 28, 1948, and made effective as of May 18, 1948. No order for an increase was sought from or granted by that authority with respect to the leases shown in Class III. The reason for this was the Decontrol Act of Congress (Public Law 129), to which reference is later made in this opinion. Notice of the sanctioned $5 increase was mailed by the Office of the Housing Expediter to the defendant and to each of the tenants in Classes I and II.
The stipulation in this case contains the admission that the $5 increase which the defendant demanded by its letter of March 1, 1948, is lawful and valid only if the allowance of that increase was within the legal power of the Federal Housing Administration or the Office of the Housing Expediter. In considering this question I shall deal with the three classes of tenants in the inverse order.
As to the 152 tenants in Class III there can be no doubt as to the validity of the increase sanctioned on March 1, 1948, by the Federal Housing Administration. As is stated in paragraph 7 of the stipulation of facts herein: "By force of Public Law 129, passed by the 80th Congress of the United States of America (Chapter 163 — First Session) and effective at midnight on June 30, 1947, the entire garden apartment project owned by the defendant, known as Stuyvesant Town (to which the plaintiffs' tenancies relate) was completely decontrolled from rent regulation and fixation, except against veterans of World War II and their immediate families holding contracts for the rental of such housing accommodations, as provided for in Section 202, subdivision (c)-(3)." Section 202, subdivision (c)-(3) reserves from the decontrol legislation rental contracts then already held by veterans of World War II and their immediate families. The reservation is expressed in the following words: "* * * except that contracts for the renting of housing accommodations to veterans of World War II and their immediate families, the construction of which was assisted by allocations or *Page 416 
priorities under Public Law 388, Seventy-Ninth Congress, approved May 22, 1946, shall remain in full force and effect." (Italics supplied.) Thus it is obvious that the leases for the 152 apartments held by the tenants in Class III, having all been made and executed after July 1, 1947, were free of all federal statutory rent regulation. The only leases with veterans where the rent was still subject to statutory regulation were those made prior to June 30, 1947. These, said Congress, "shall remain in full force and effect." The reservation did not and could not apply to leases created subsequent to June 30, 1947.
Although the 152 leases in Class III were freed of statutory rent regulation, this is not to say that that was all that had to be done to make lawful the $5.00 increase which the landlord demanded from those tenants, the demand being made on March 1, 1948, as of April 1, 1948. Notwithstanding that the 152 leases were emancipated from statutory control, the landlord was nonetheless subject to the performance of its agreement with the Federal Housing Administration not to change the rent without that agency's approval. As already stated, that approval was obtained on March 1, 1948, so that on April 1, 1948, the date when the lessor's demand for the $5 increase was to become effective, it was lawful for that demand to be made. On that date the statutory control no longer existed and, further, the Federal Housing Administration had previously approved the rental increase.
As to the 31 tenants in Class II, it is stipulated that their leases were all executed subsequent to July 1, 1947, and that they took possession under those leases subsequent to that date. These 31 leases differ only from the 152 leases in Class III in that the former bear a date prior to July 1, 1947. This difference is unimportant. The date of a written instrument is not controlling. Actual execution and delivery are essentials to the contract arising and being enforceable. Particularly is this true where the instrument is a lease for real estate for more than three years. Here the Statute of Frauds steps in and requires such instrument to be put in writing and "signed by the parties so making or creating the same." *Page 417 
(R.S. 25:1-1.) It seems to me inescapable that these 31 leases must be regarded no differently than the 152 leases in Class III. The apartments affected by those 31 leases had been freed from statutory rent control before the leases themselves were made. The only remaining control was that springing from the existing agreement between the owner and the Federal Housing Administration by which there could be no increase without that agency's approval. That approval was given on March 1, 1948, and thereupon the approved increase of $5 was lawfully within the owner's demand.
As to the 37 tenants in Class I, it is stipulated that their rights arose prior to July 1, 1947. Those rights were saved from the operation of the decontrol legislation passed by Congress and made effective on June 30, 1947. That meant that those 37 leases continued subject to statutory control. That meant that there could be no increase in their stipulated rentals without the approval of the statutory agency, the Office of the Housing Expediter. Of course, the approval of the Federal Housing Administration was also needed to allow such lawful increase. It could hardly be said that an increase which breached the contract between the owner and the Federal Housing Administration could be lawful, although sanctioned by another Federal Agency. No valid objection is here available to the tenants in Class I. The written approval of both agencies was obtained. On March 1, 1948, the Federal Housing Administration, in writing, approved the increase and on June 28, 1948, the Office of the Housing Expediter approved each like increase separately and specifically, that approval being made effective as of the date of the application therefor, viz., May 18, 1948.
It also appears that when the defendant obtained from the Office of the Housing Expediter specific written approval with respect to each tenant in Class I, it obtained like approval for each tenant in Class II. For reasons already shown, no such approval for the tenants in Class II was needed, since their apartments were decontrolled and the Federal Housing Administration had approved the increase. But it also seems that the Office of the Housing Expediter's approval was not *Page 418 
needed with respect to the tenants in Class I. The Federal Housing Administration regulations, which were made part of the mortgage contract between owner and Federal Agency, clearly indicate that that Agency's rentals govern unless and until some other agency actually regulated the rentals of the project. This contemplated actual regulation by another agency, in which event the Federal Housing Administration regulation marked time and became operative again when the other agency's regulation terminated. The scheme or idea was apparently one designed to avoid two federal agencies controlling the same subject matter. That being so, the approval given by the Federal Housing Administration on March 1, 1948, made it altogether unnecessary for the owner to seek or obtain the specific approvals from the Housing Expediter. That the owner did both can furnish to the tenants no ground of objection. Counsel for the plaintiffs in their brief characterize the Expediter's approval as an "ex postfacto" approval and he argues that by the act of obtaining it the defendant conceded that the Federal Housing Administrator's approval was illegal. This is clearly a non sequitur. The first approval being a lawful one, the second was unnecessary and meaningless. It might, however, be suggested that when the Housing Expediter did in fact issue his specific determinations increasing the rent, that act replaced functionally the power of the Federal Housing Administration. If this reasoning were adopted, the result would remain unchanged, for the $5 increase would, under the Federal Housing Administration's order be valid for the months of April and May, 1948, and the Housing Expediter's order would be valid for June, 1948, and thereafter.
It is held that it was lawful for the owner, holding the federal approval above mentioned, to demand the approved increase, as was reserved to the owner by the fifth clause of the lease between it and its tenants. This brings me to an interpretation of that clause, it being argued by the plaintiffs that the landlord could not by unilateral action increase the stipulated rents and that for its validity such increase requires the consent of the tenants. *Page 419 
What is the true purpose, design and intent of paragraph 5 of the lease? A most excellent guide for the court was furnished by Mr. Justice Heher in Mantell v. International Plastic HarmonicaCorp., 141 N.J. Eq. 379, at p. 386 (E. A.). In considering a distributor's contract where future prices had not been fixed, he said:
"The general purpose of the agreement is to be considered in ascertaining the sense of particular terms. The design of the parties to a written contract is to be collected from the instrument as an entirety. And the writing is to have a reasonable construction. Disproportionate emphasis upon a single provision does not serve the purpose of interpretation. Words, phrases and clauses are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intention. The literal sense of the terms may be qualified by the context. The significance of a particular part of the writing is determined by a consideration of all its parts. It is the revealed intention that is to be effectuated. In a word, the standard of interpretation is the meaning that would be attached to the integration by a reasonably intelligent person. And, in the quest for the common design, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain, are to be regarded. Monmouth ParkAssociation v. Wallis Iron Works, 55 N.J. Law 132; CornExchange National Bank and Trust Co. v. Taubel,113 N.J. Law 605, 607; Bullowa v. Thermoid Co., 114 N.J. Law 205; Cameronv. International Alliance, 119 N.J. Eq. 577."
The situation of the parties in the instant case was a matter of common experience. The defendant was engaged in erecting a large housing project at a time when, the court judicially notices, there was a great shortage of housing in the land and building costs were high and mounting. Even before the project was finished the Federal Housing Administration had established a schedule of maximum rents. The adequacy of that schedule could not be foretold with any degree of certainty. Increased costs of construction to complete the project, increased costs of maintenance and operation, and increased taxes might well prove later that the earlier schedule of rentals was both inadequate and inequitable. Hence the power lodged in the Federal Agencies to allow increases to overcome such inadequacy. Until tested by time landlord and tenant contracted on the basis of the *Page 420 
lower and established monthly rental. But the intended purpose of both parties was that those rentals be not rigid and unchangeable but that the landlord should be free to increase the rent whenever such rentals might be lawfully increased, and that upon such notice of increase "the increased rent shall be the rent reserved under this lease for the balance of said term." While it is true that the provision does not define the measure of the increase or express a mode for its ascertainment, yet the silence of the parties was occasioned by the exigencies of the particular situation and "thus they imported into their contract the standard of reasonableness which the law implies in a contract mute as to price and providing no mode or standard for the fixation of the price." Mantell v. International PlasticHarmonica Corp., supra. It is fair to assume that the $5 increase was a reasonable one, since it was governmentally approved upon a showing of increased costs of construction, operation and taxes. There is no evidence before this court indicating any unreasonableness in the increase. Assuming, however, that such increase required the assent of the tenant, proof of that assent is present in the case. The very clause which reserved to the landlord the right to demand the increase afforded to the tenant the means of avoidance. The tenant was not obliged to submit to the increase. He was given the right to cancel and terminate his lease and move from the demised premises within 90 days after the first day of the month following the demand for the increase. This was a right of rescission afforded to and reserved by the tenant. In effect he was given an election. He could either remain under his lease at the increased rental or, as an alternative, give up his apartment. In the instant case he had until July 1st within which to do the one or the other. If he did not rescind, he necessarily elected to stay and thereby assented to the increase. About 500 tenants chose to stay and pay the increase. The 220 plaintiffs chose to stay but declined to pay the increase until this court passed upon their rights. They filed their complaint herein and by their stipulation, made in open court, on March 25, 1948, undertook to pay the increased rent pending *Page 421 
the suit. The defendant agreed to deposit the increase with the clerk of the court to abide the result of this case. That has been done and the plaintiffs have remained in possession for over a year. The plaintiffs have by their conduct — their selection not to terminate the lease — assented to the increase, subject only to the question as to whether it was lawful for the defendant to demand the increase. Their payment of the increase "without prejudice" meant no more than that the fact of payment was not to impair or prejudice their complaint addressed to the lawfulness of their landlord's action. As I have above indicated, the legality of that action stands established. It is therefore held that the $5 increase in question is a lawful one and is binding upon all the plaintiffs as of April 1, 1948.
After the foregoing portion of the opinion was prepared, the court received a supplemental memorandum from the attorney for the plaintiffs, in which reference is made to the very recent opinion of our Supreme Court in G. Loewus Co., Inc., v.Vischia, 2 N.J. 54. Based on that decision the plaintiffs' attorney argues that the provision in the lease relating to an increase in rental is unilateral and lacks mutuality and, hence, is not enforceable. I have examined the opinion in the cited case and I deem it wholly inapplicable to the instant situation. In the Loewus case the court dealt with a contract where the defendant promised to sell wine to the plaintiff according to the latter's requirements, but the plaintiff was under no promise to buy the commodity. As was pointed out in the opinion of the Supreme Court, "the undertaking of the plaintiff is left to depend for its very existence upon its future election as to whether it will purchase from defendant any bottled wine * * *." It was very evident in the cited case that an executory contract between the parties never arose. The essential element of a bilateral contract was there lacking; there was no promise for a promise. The case here is entirely different. When the leases were signed and delivered by the parties, there arose at once a binding bilateral contract. The rent itself was fixed, subject to being increased in a reasonable amount when the landlord *Page 422 
could lawfully demand the increase. It may even be said that the parties intended that a reasonable increase shall be one made lawful by the approval of the federal agency. As has already been shown, the $5 increase was so approved and was lawful. Paragraph 5 of the lease has the added virtue that the so-called "unilateral action of the landlord" was not necessarily binding on the tenant. The lease gave the tenant the choice of assenting and submitting to the increase or, alternatively, vacating the premises. Plaintiffs' counsel is quite aware that this choice given to the tenant is an answer to his objection. He says in his brief, "Normally this might be so, but the housing shortage, which has become a public emergency, precludes it, so that the tenant has no choice." The court cannot see how the housing shortage relieves the tenant from his agreement either to pay the increase or surrender his lease. The housing shortage cannot alter the law of contracts. So far as that shortage gave rise to governmental regulations, the tenant may claim all the protection which those regulations furnish, but cannot escape those provisions in the regulations which furnish just treatment to the landlord, particularly where the parties expressly made provision therefor by the language of paragraph 5 of the lease.
Judgment will be entered in accordance with the foregoing conclusions. Submit, on notice, form of judgment.