This appeal involves the validity of agreements made by the owner of a patent for a heat exchanger with individuals who agreed to distribute and sell the product.
The plaintiffs (Thermal Systems of Alabama, Team Energy Management Consults, and W. Frank Todd) based their action upon theories of breach of contract, interference with business or contractual relations, and unfair competition. The trial judge held that the contracts upon which plaintiffs sued were unenforceable because of uncertainty or lack of mutuality of obligation. Based solely upon this holding, the trial judge granted summary judgment in favor of the defendants (J. Boyd Sigafoose, Thermo Conducting Systems, Don A. Druse, and Donn Kaufman) on all of the plaintiffs' claims.
Plaintiffs raise two issues on appeal: whether the trial judge erred (1) in holding the contracts invalid, and (2) in concluding that the invalidity of the contracts precluded plaintiffs' claims for interference with business or contractual relations.
 FACTS
Boyd Sigafoose owned Thermo Conducting Systems, Inc. ("Thermo Conducting"), which manufactured and sold a heat exchanger called a "Go-Between." Sigafoose designed this heat exchanger for the purpose of reducing the costs of heating water. A Go-Between, when installed between a refrigeration or air conditioning unit and a water heater, utilizes the hot freon from the refrigeration or air conditioning unit to heat the water in the heater. Sigafoose designed the Go-Between so that the hot freon and the water never come into direct contact. Sigafoose received letters patent on the Go-Between, issued June 7, 1983, for the term of 17 years. The Go-Between was the sole product manufactured by Thermo Conducting.
Beginning in 1982, Sigafoose began to grant distributorships for the purpose of marketing and selling the Go-Between, and the plaintiffs operated the distributors of the Go-Between.
Although the facts are disputed, we set out a summary of the facts and the claims of the parties, as we understand them.
 I
On June 30, 1983, Thermo Conducting entered into a written contract with plaintiff Thermal Systems of Alabama, Inc. ("Thermal"). Under the contract, Thermal became the exclusive distributor for the Go-Between product within a certain defined territory in Alabama. The contract set up an arrangement, expressly referred to as a "franchise," whereby Thermal had the right to purchase Go-Betweens from Thermo Conducting for the purpose of resale to "commercial accounts." The contract specifically stated that Thermal was not an agent of Thermo Conducting and was not authorized to transact any business in Thermo Conducting's name. The contract stated that Thermo Conducting was "relying upon [Thermal] for satisfactory representation of Manufacturer's Products in sufficient volume, properly servicing such products, and maintaining the good will of the public." The contract refers to Thermo Conducting as "Thermo Conducting" and as "Manufacturer." The contract refers to Thermal as "Dealer." *Page 569 
According to the contract, title to the Go-Betweens would pass to Thermal upon purchase. Thermal would provide a "Manufacturer's Warranty" to each of its subsequent retail purchasers, and Thermal would obligate itself to perform the requirements of the warranty.
In the contract, Thermo Conducting expressly disclaimed liability for failures or delays in filling any orders of Thermal when those failures or delays were due to certain prescribed events, "or any causes beyond the control" of Thermo Conducting.
The contract was silent concerning its duration. However, the contract did state that Thermal (dealer) could terminate the contract at any time by giving 30 days' written notice. The contract also provided that Thermo Conducting could terminate the contract in the event of certain prescribed contingencies.
On December 7, 1983, Thermo Conducting entered into another contract with Thermal, identical to the June 30, 1983, contract, in which it granted Thermal an exclusive distributorship for a certain defined territory in Florida.
On November 28, 1984, Thermo Conducting and Thermal amended the two contracts then existing to extend Thermal's exclusive distributorship territory to cover the entire states of Alabama and Florida. The president of Thermal stated that two of the major reasons he contracted with Sigafoose were (1) his knowledge that the Go-Between was patented, and (2) Thermal's "exclusive" distributorship under those contracts, i.e., no one else, including Sigafoose, could sell the Go-Between in Thermal's territory. The president of Thermal also stated that Sigafoose orally promised to protect Thermal against any patent infringers.
Sometime in late 1984, the officers of Thermal, president Larry Cantrell and vice-president Pete Sintz, learned that Sigafoose was interested in selling his patent and the assets of his company. Cantrell claims that Sigafoose promised him that any sale would have no effect on Thermal's exclusive territorial contracts. Sintz made several attempts to buy Sigafoose's assets. Sintz contacted a business brokerage firm to obtain help in arranging the financing necessary for his purchase. The firm was unable to help Sintz, but promised him a portion of its commission should the firm be able to find a purchaser for Sigafoose. The brokerage firm subsequently located a purchaser, Donn Kauffman. Kauffman purchased the assets of Thermo Conducting.
On March 27, 1985, Sigafoose executed a bill of sale to Kauffman conveying the assets of the company — goodwill, inventory, equipment — as well as Sigafoose's interest in the patent, trademark, and trade name "Go-Between."
On April 11, 1985, Kauffman incorporated S K Thermal Conducting Systems, Inc. ("S K"), for the purpose of manufacturing and selling the Go-Between, its sole product. Sigafoose became a shareholder of S K. On May 7, 1985, Sigafoose executed another document, purporting to again assign to Kauffman his entire right, title and interest in the patent and trademark "Go-Between." On the same day, Kauffman assigned his interest in the patent and trademark to S K. Sigafoose's certificate of registration for the trademark, however, was not issued until June 11, 1985. His application for the trademark had been filed in August 1983. On September 24, 1985, S K reassigned its interest in the patent to Kauffman.
Cantrell, in his affidavit in opposition to the defendants' motion for summary judgment, stated that "[d]uring the entire time the business and patent were up for sale, Mr. Sigafoose told me on several occasions that a sale of the business and patent would have no effect on [Thermal's] contracts." One of Thermal's sales personnel also averred by affidavit that Sigafoose had told him that "the sale would not affect the dealership franchise" with Thermal.
Cantrell stated that on April 10, 1985, following the sale, he received a letter from Kauffman, president of S K, enclosing an unsigned document entitled "Amendment to Agreement." The letter stated in pertinent part as follows: *Page 570 
 "Per our conversation in my office on Friday, April 5, 1985, and the attached cancellation of your contract, which Mr. Sigafoose assures me you have received, I wish to offer you a 90 (ninety)-day contract. . . . At the end of the ninety (90) days, on the agreement of both parties, we can extend an additional short term contract to cover any active quotations or a long term contract either on a representative or stocking distributor base.
 "If we have not heard from you in the next ten (10) days, we will assume that you have no interest."
The "attached cancellation" was the document entitled "Amendment to Agreement." Though unsigned, it purported to be an agreement between Sigafoose and Thermal to modify their prior agreements so as to confer upon Sigafoose the authority to terminate those agreements at any time with 30 days' written notice. Thermal already had this authority under its contracts with Sigafoose. The "Amendment to Agreement" further stated:
 "C. Thermo Conducting Systems is presently negotiating with another party for the sale of its trademark and license of its patent rights with respect to its products (referred to in said Agreement and herein as Manufacturer's Products), and it is contemplated that in such a transaction, with said party or any other party, requirement would be made that franchise rights under said Agreement, and similar agreements with other dealers in other territories, would be terminated. It is further contemplated that in such such [sic] event such assignee and licensee would endeavor to make mutually satisfactory agreements with all such dealers, but no commitment or representation with respect thereto is made by Thermo Conducting Systems.
 "D. The parties hereto contemplate that it would be in the mutual interest of both parties to continue to operate under the general terms of said Agreement as herein amended unless or until the time when definite notice should be given of an effective date of termination."
On April 19, 1985, counsel for Thermal wrote to both Sigafoose and Kauffman, stating that the "Amendment" was unexecuted and that Kauffman "has no legal basis to terminate the original agreements" with Sigafoose. Thermal's counsel further informed Kauffman and Sigafoose that Thermal intended to abide by and enforce its contracts with Sigafoose.
On April 26, 1985, counsel for S K replied by letter that "[n]either Mr. Kauffman nor S K Thermal Conducting Systems, Inc., has any agreement with Mr. Sintz [Thermal's vice-president] to be amended. I believe that Mr. Kauffman has discussed a sale authority with Mr. Sintz, but if so, it is an entirely new arrangement." The letter further stated that Mr. Kauffman did not acquire "accounts payable nor the assignment of any contracts" when he purchased the assets of Sigafoose's business.
Thermal attempted to establish a working relationship with S K and began to purchase Go-Betweens from S K. However, at some point in time, S K began to call upon some of Thermal's customers, using information obtained from Thermal, without Thermal's knowledge or consent, and offered Go-Betweens to these customers at prices lower than those quoted by Thermal's sales personnel.
Bill Herring, one of Thermal's sales personnel, by way of affidavit, listed several sales that he had lost because of S K's interference.
On August 22, 1985, counsel for Kauffman advised Sintz by letter that S K did not wish to "extend the [90-day] sale privileges" granted to Thermal on April 10, 1985, and that those sale privileges had expired. The letter instructed Sintz to immediately inform Thermal's "sales personnel to make no representations that they are authorized to sell the 'Go-Between.' "
Thermal instituted this action, joining with other plaintiffs, alleging that Sigafoose and Thermo Conducting breached the June 1983 and December 1983 contracts with Thermal. Thermal further alleged that S K assumed Sigafoose's obligations under those contracts by purchasing the *Page 571 
assets of Sigafoose's business. Thermal further alleged that S K tortiously interfered with the business relations existing between Thermal and its customers or potential customers.
The trial judge held that the June 1983 and December 1983 contracts were void and unenforceable for uncertainty or lack of mutuality of obligation. We disagree with the learned trial judge.
 II
We hold that the contracts were valid under the provisions of Alabama's Uniform Commercial Code. Each contract contains the following language:
 "The purpose of this Agreement is to establish Thermal Systems of Alabama, Inc., as the exclusive dealer of Thermo Conducting systems products."
Alabama's U.C.C. contains the following specific provision concerning exclusive-dealing contracts:
 "(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."
Ala. Code 1975, § 7-2-306(2).
The Official Comments to § 7-2-306 state the following:
 "Subsection (2), on exclusive dealing, makes explicit the commercial rule embodied in this Act under which the parties to such contracts are held to have impliedly, even when not expressly, bound themselves to use reasonable diligence as well as good faith in their performance of the contract. Under such contracts, the exclusive agent is required, although no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be. The principal is expected under such a contract to refrain from supplying any other dealer or agent within the exclusive territory. An exclusive dealing agreement brings into play all of the good faith aspects of the output and requirement problems of subsection (1)."
Applying § 7-2-306 to the exclusive-dealing contracts at hand, we conclude that Thermo Conducting, under the terms of the agreement, had an obligation to use its best efforts to supply Go-Betweens to Thermal, and that Thermal had an obligation to use its best efforts to promote their sale. In other words, § 7-2-306 imposes mutual obligations on the parties to an exclusive-dealing contract.
Thermo Conducting argues, however, that the contracts are void for lack of mutuality because Thermo Conducting assumed no obligation under the contract to manufacture Go-Betweens. However, the means by which Thermo Conducting was obligated to supply Go-Betweens to Thermal is relevant not to the validity of the contracts, but to their breach. By statute, Thermo Conducting was required to use its "best efforts" to "supply" Thermal with Go-Betweens during the duration of the contracts. Ala. Code 1975, § 7-2-306.
Nonetheless, Thermo Conducting contends that the contracts contain no stated term of duration and are invalid for that reason. It cites Pulliam v. Schimpf, 109 Ala. 179, 19 So. 428
(1895), and Cosby-Hodges Milling Co. v. Riley, 227 Ala. 347,149 So. 612 (1933), wherein contracts were held invalid, at least in part, because they contained no stated term concerning their duration. However, Alabama's U.C.C., enacted after those cases were decided, contains the following provisions:
 "(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.
 "(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party. . . ."
Ala. Code 1975, § 7-2-309(2) and (3). (Emphasis added.) Thus, a contract governed by the provisions of the U.C.C. is not invalid solely because it contains no stated term of duration. *Page 572 
We hold, therefore, that the question of the duration of the agreement is a factual question. The plaintiffs claim that they were promised that they had the exclusive right to sell the Go-Between. A fact question is thus presented on what each party had a reasonable right to expect from the other party. Therefore, the trial court erred in granting summary judgment. See Rule 56(c), Ala.R.Civ.P.
 III
The second issue Thermal raises on appeal is whether the trial court erred in concluding that because the June 1983 and December 1983 contracts were invalid, that finding was dispositive of Thermal's claims against S K for interference with business and contractual relations. Because we reverse the trial judge's holding that the contracts were invalid, we do not address this issue. On this appeal, we do hold that the trial judge erred in granting summary judgment on the plaintiffs claim based solely on the allegedinvalidity of Thermal's contracts with Sigafoose. We believe the trial court can resolve any other legal issues that remain in view of our holding. IV
In 1982, Sigafoose granted a distributorship to Maynard Peters and Allen Peters. Although Sigafoose sent a proposed written agreement to the Peterses, (identical to Sigafoose's contracts with Thermal), the proposed agreement was never executed by either party; however, it is alleged that Sigafoose and the Peterses undertook to establish a working relationship in accordance with the terms of the agreement, and that in 1983, the Peterses, through their partnership, Hotline Distributors, granted a sub-distributorship (with Sigafoose's consent) to plaintiff Frank Todd. Todd was, thus, authorized to purchase Go-Betweens from the Peterses, but Todd had no contract with Sigafoose.
By letter dated January 1, 1984, Sigafoose reaffirmed Thermo Conducting's exclusive dealership with Hotline. The letter set forth Hotline's exclusive territory. Sigafoose stated in the letter that "[y]ou realize, of course, that you have a right of establishing dealerships within that territory." The letter stated that "[t]his agreement runs from January 1, 1984 through January 1, 1985." Allen Peters sent a copy of this letter to Todd, his sub-distributor.
In February 1984, Todd incorporated Team Energy Management Consultants, Inc. ("Team Energy"), as the entity through which Todd would operate his sub-distributorship.
In November or December 1985, Todd learned, as had Thermal, that Sigafoose was planning to sell his patent and his company. He also learned that Cantrell and Sintz of Thermal were negotiating with Sigafoose.
In February 1985, when Sigafoose had not yet sold his company, Todd asked Sigafoose for a direct distributorship contract. Sigafoose refused, because a sale of the company and the patent were pending, but allegedly promised that Todd's and the Peterses' distributorship would continue.
In April 1985, Todd allegedly met with Kauffman and Druse of S K. Todd received a letter from Druse dated April 30, 1985, which stated in pertinent part as follows:
 "As per our phone conversation of April 29, 1985, we were most happy to hear of the potential orders you expect in the near future. As I had mentioned, we are making every effort to work within the distribution structure which was previously established by Mr. Sigafoose, and have agreed to supply GO-BETWEEN's to your current supplier, Mr. Maynard Peters of Louisville, Georgia, at the cost established by Boyd [Sigafoose] for a period of ninety (90) days beginning March 23, 1985; this in turn should protect your position on all outstanding quotations.
 "As to any type of agreement, at this time we have none available, but, as discussed, we will protect you on an account by account basis if you will kindly supply us with copies of the purchase order and/or contracts."
Todd alleges that he gave the names of his customers to S K, as requested, because S K promised to protect Todd from interference with those customers. Todd alleges *Page 573 
that S K did interfere with his business relations with those customers, causing him to lose those accounts.
Todd and Team Energy assert on appeal that the trial judge erred in granting summary judgment against them on their claim against S K for tortious interference with business and contractual relations. Todd contends that the evidence submitted in opposition to the defendants' motion for summary judgment evidences an agreement between S K and the Peterses and Todd. The trial judge's order states the following: "The Court finds that the agreements upon which plaintiffs sue and predicate all of the causes of action and claims for relief are void and unenforceable for uncertainty or lack of mutuality of obligation." As relates to Todd and Team Energy, we are not certain whether the court merely concluded that Sigafoose's contract with the Peterses was invalid, or concluded that S 
K had no contractual relations with Todd after S K purchased the patent, or reached both conclusions; however, we hold, as we did in the case of Thermal, that, regardless of the validity of the contract existing with Sigafoose, the trial judge was due to consider the evidence of separate contractual relations with S K, established after the sale of the patent to S K, before granting summary judgment in favor of the defendants. We reverse the summary judgment and remand the cause for further proceedings consistent with this opinion.
 V
By reversing the summary judgment, we should not be understood as holding that Thermal had a "license" from Sigafoose to manufacture the Go-Between. In short, our holding is limited to the sole question whether the trial court correctly concluded that the agreements were invalid.
REVERSED AND REMANDED.
TORBERT, C.J., and ALMON, BEATTY and HOUSTON, JJ., concur.