JO–ANN, INC., Plaintiff,

v.

ALFIN FRAGRANCES, INC., Defendant.

Civ. A. No. 87–3782.

United States District Court, D. New Jersey.

Oct. 23, 1989.

---

Richard J. Shackleton, Shackleton, Hazeltine & Buczynski, Ship Bottom, N.J., for plaintiff.

Gary F. Werner, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

Jo–Ann, Inc., a corporation incorporated under the laws of Iceland, brought this diversity action against Alfin Fragrances, Inc., a New Jersey corporation, for breach of an alleged exclusive distributorship agreement to import and distribute the defendant's beauty care products.

Now, Jo–Ann, Inc. has moved for partial summary judgment on the issue of liability for breach of the agreement.

In turn, Alfin Fragrances has cross-moved for summary judgment, contending that there was never an exclusive distributorship agreement between the plaintiff and itself under common law or the Uniform Commercial Code ("UCC"), New Jersey version. Moreover, Alfin posits that if an agreement did exist, then it was void for vagueness, indefiniteness or complete non-existence of essential terms. Last, the defendant argues in support of its motion that if a contract did exist, then the agreement was terminable at will and, further, the plaintiff suffered no ascertainable loss on account of the termination.

On July 12, 1989, the parties were before me to argue their respective motions for summary judgment. At that point in time, I indicated my concerns that the provisions of the Uniform Commercial Code might be pertinent to this action. Accordingly, I ordered the parties to answer two questions for me in their supplemental briefs: (1) whether I should apply the New Jersey provisions of the Uniform Commercial Code to mete out the disputes raised in conjunction with the instant action and (2) if the first issue was answered affirmatively, I called upon them to show me what exact provisions of the Code are outcome-determinative of their respective positions.

Picking up the legal gauntlet which the Court threw down, both parties have ably brought forth their positions. It is now time for the Court to decide this matter.

The elemental facts of this matter are not disputed. What is hotly contested, however, is what these facts mean as a matter of law. I will first detail the elemental facts.

### FACTS

On September 3, 1986, Anna Bjornsdottir of the plaintiff sent a letter to Irwin Alfin soliciting Alfin to enable Jo–Ann to distribute Glycel products, a line of beauty care products, to Iceland consumers. The correspondence asked for information regarding other Alfin products, as well.

Evidently, an earlier telephone conversation spawned this correspondence, but there is no detailing of that conversation in the record before me.

Another telephone conversation occurred between a representative of the plaintiff and Alfin and, thereafter, Alfin sent samples of the Glycel products to the plaintiff. *See* Alfin Affidavit, Paragraph 3.

Ms. Jona Sigurjonsdottir, another representative of the plaintiff, then replied to Alfin's delivery by way of a September 23, 1986 telex which stated in full:

"Thank you so much for your quick response. We have received the Glycel samples you sent us and are ve[r]y impressed. We also like the fragrance Ombre Rose very much. We are very excited to be the exclusive distributors for these products in Iceland. We have not received any prices yet. Please send us your net prices on each item as soon as possible. For our market introduction, it will also be helpful to have brochures or whatever other sales material you usually provide such as introductory miniature samples and display materials for shelves and windows. This is what we need to start our introduction of your excellent products in Iceland."

The defendant responded to this telex by way of a September 29, 1986 telex from Mr. Alfin which stated:

"In response to your Telex dated Sept. 22, the following prices are the prices you will be invoiced at—FOB Zurich for Glycel and FOB Paris for Ombre Rose...... Glycel—21 percent of U.S. retail. Ombre Rose—22 percent of U.S. retail. We will provide an allowance of five percent on your net purchases for free goods. This will cover samples, displays, brochures, etc. Under separate cover I am sending you selection of this material. All advertising and display material will be invoiced to you at our cost plus 10 percent for handling. Please advise how many points of sale you expect to open for each of the brands and also forward your opening orders as soon as convenient for you. I look forward to a pleasant and mutually profitable arrangement. Our understanding is that you will be the exclusive distributor for the domestic market in Iceland."

It appears from the record that the parties did not specifically agree upon (1) the duration of the alleged contract (Sigurjonsdottir Dep. at 26–27); (2) the quantity of product that would be purchased (*Id.* at 61); (3) the timing of payments (*Id.* at 99); (4) how much inventory the plaintiff would maintain (*Id.* at 100); and (5) the methodology of termination (*Id.* at 101).

It appears that after Alfin sent this telex, the plaintiff thought that it had an agreement for an exclusive distributorship with the defendant. It does not appear that Alfin had the same internal understanding as the plaintiff. Two of the defendant's interoffice memoranda state respectively:

"Per Ms. Anna Bjornsdottir's call yesterday, FP sent her, to Iceland address, one Ombre Rose and one Glycel U.S. order form.

"She had received IA's telex 6087 Sept. 29th but the order forms were not included in the materials she received from Art Ludwig. She asked for the names of the contacts in both Switzerland and France but told her, until we had an agreement, this info would not be pertinent."

That memo was dated October 16, 1986.

Further, another internal memorandum dated October 8, 1986, stated that:

"Please send the attached no charge orders to a potential distributor in Iceland who will probable distribute Glycel and Ombre Rose. [Irwin Alfin] has not given his final OK yet but wishes them to receive the listed merchandise in both Glycel and Ombre Rose.

"Please advise whether you are going to ship."

In late 1986, Mr. Moreau, a representative of the defendant, was to travel to Iceland to examine the plaintiff's operations. After a delay, Mr. Moreau met with the plaintiff's representatives and, in view of this meeting, recommended that Alfin utilize another company as its distributor in Iceland. Mr. Moreau did not believe that using Jo–Ann would be in Alfin's best interest.

In this regard, he Telexed Mr. Alfin on January 16, 1987, stating:

"1) Jo–Ann/Mrs. Jona Sigurjonsdottir.

"As I told you this company is not the right one to distribute Glycel in Iceland. Considering the various contacts you have had with this lady since months please Telex her ASAP that you regret to be unable to accept her proposal.

"2) Other companies I met: Artica/M. Kristmanns and Helgason/M. Half Danarson. I Telex them a negative answer. Klassik—they are not interested.

"3) Gasa Import/Mrs. Rosa Matthiasdottir—manager

"She is the right distributor. Products she imports and distributes:

"—Sothys Treatment = mass market (90 outlets)

"—Stendahl Treatment + make up (selective distribution)

"—Atkinsons Perfumes from Italy.

"—Jewelry and handbags from Italy as well as ties and scarves."

On the same date, Ms. Sigurjonsdottir telexed Mr. Alfin, stating:

"I have been trying to reach you on the phone since my meeting with Mr. Moreau. There are certain points that I need to discuss with you regarding preparations for the intro of Ombre Rose and Glycel in Iceland because like Mr. Moreau said—Mr. Alfin is the boss and it is entirely up to him.

"Also Mr. Moreau did not seem to be aware of your commitment made to us in your telex of September 29, 1986. So I ask you pls accept my telephonecall coming Monday 20th January early office hours N.Y. time or will you be kind enough to call me next Monday or TLX me when I can expect your telephonecall."

On January 19, 1987, Mr. Alfin notified Mrs. Sigurjonsdottir that Alfin would not be utilizing the plaintiff's services. Specifically, he stated:

"In reference to your Telex of January 16th. Please understand that my Telex to you of Sept 29, 1986 was of course based on our further investigation of the market which is the reason Mr. Moreau visited you and other potential distributors.

"I regret to inform you that based on his survey we have made a decision for distribution which excludes the possibility of our working with you.

"I would like to thank you for your interest and hope that one day we will have a chance to meet."

This, of course, greatly disturbed the plaintiff, causing Mrs. Sigurjonsdottir to write Mr. Alfin the following Telex on January 23, 1987, stating that:

"I consider the contents of your TLX No. 8081 dated Jan. 19, 1987 a blatant violation of the commitment you made to me in your TLX No. 6087 dated Sept. 29, 1986.

"It should be as obvious to you as it is to me.

"The record speaks for itself."

This letter did not persuade the defendants; apparently Mr. Alfin granted the exclusive distributorship for Glycel and Ombre Rose products to a company named GASA.

In view of this fact, Jo–Ann filed its three-count complaint in this action on September 17, 1987. Specifically, the complaint averred in Count 1 that the defendant breached the contract that it had

made with the plaintiff by way of the defendant's September 29, 1986 communication with the plaintiff when the defendant telexed the plaintiff on January 19, 1987, that the plaintiff was not a distributor for the defendant. The second count stated that the defendant's actions interfered with the plaintiff's business relations with its prospective customers. With respect to these two counts, the plaintiff asked for compensatory damages, counsel fees, interest and costs. The third count stated that the defendant intentionally, willfully, wantonly, maliciously, and deliberately led the plaintiff to rely, to its detriment, upon the alleged agreement. For this alleged malicious act, the plaintiff sought punitive damages, counsel fees, interest and costs of suit.

On June 23, 1989, the parties filed a final pretrial order in this action. It appears, from the pretrial order, that the plaintiff is no longer pressing Counts 2 and 3, narrowing this action to one sounding solely in contract. *See* Federal Rule of Civil Procedure 16 (a pretrial order shall control the subsequent course of action unless modified by subsequent order). With this background in hand, I turn to the law of summary judgment.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure states that a court may only grant summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, viewed in a light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56(c). An issue of material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 248, 106 S.Ct. 2505, at 2510, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable or [it] is not significantly probative, summary judgment may be granted." *See Anderson*, at 249–50, 106 S.Ct. at 2510–11 (citations omitted). Facts are material if they affect a lawsuit's outcome under the governing law.

Specifically, with respect to materiality, the United States Supreme Court has stated that "the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248, 106 S.Ct. at 2510. Hence, in moving for summary judgment, it is elemental that the parties must point out to the court the proper substantive law. Armed with the proper substantive law, the court will then scrutinize the record for genuine issues or for the lack of same.

■ I note, in this regard, that both sides agree that New Jersey law should apply here. Thus, when the parties left this court on July 12, 1989, there were two bodies of law that could have applied to this cause of action (1) the New Jersey common law of contract or (2) the provisions of the New Jersey Uniform Commercial Code supplemented by New Jersey common-law precepts. I believe, upon reflection, that the latter alternative is the proper one.

In so holding, I am well aware that the New Jersey Supreme Court has not specifically ruled on what body of law to apply in a factual context such as confronts this Court today. In the absence of a New Jersey Supreme Court decision directly on point, this Court must predict how that court would decide the issue. In predicting same, I

"must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand [and I] should not accord to any particular 'datum' more significance than would the [New Jersey] Supreme Court under similar circumstances...."

*McGowan v. University of Scranton*, 759 F.2d 287, 291 (3d Cir.1985) (citations and quotation marks omitted).

In this regard, one must remember that the overarching purpose of the UCC is to

create a uniform code for commercial dealing throughout the several states and territories. *See* N.J.Stat.Ann. section 12A:1–102(2)(c) (West 1962); *see also A.J. Armstrong Co. v. Janburt Embroidery Corp.*, 97 N.J.Super. 246, 234 A.2d 737 (Law Div. 1967).

Accordingly, in interpreting the uniform code, I am not as hesitant in referring to the judge-crafted law of other jurisdictions interpreting the Code, as I believe the New Jersey Supreme Court would do this as well in order to promote uniformity in the Code's interpretation.

With respect to the question of the Code's application in this instance, the United States Court of Appeals for the Eleventh Circuit, interpreting the Alabama Code, recently applied the UCC's parol evidence rule to the question of whether there was an exclusive distributorship over a certain territory. *Intercorp, Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1527–29 (1989). Similarly, in *Thermal Systems of Alabama v. Sigafoose*, 533 So.2d 567, 571 (Ala.1988), *detailed in Intercorp, Inc.*, 877 F.2d at 1527, the Alabama Supreme Court applied the provisions of the Uniform Commercial Code in reversing a trial court's grant of summary judgment where the trial court had held that an exclusive distributorship agreement was unenforceable due to no stated term of duration or lack of mutuality of obligation. 533 So.2d at 567. The Alabama Supreme Court concluded that under UCC Section 2–306(2) and the official comments thereto, Ala.Code Section 7–2–306(2) (1975), the parties had a mutual obligation to use their best efforts to supply (on the part of the supplier) and to promote (on the part of the distributor) the products in issue. The Alabama court further held that an exclusive distributorship agreement "governed by the provisions of the UCC is not invalid solely because it contains no stated term of duration." *Id.* at 571 *citing* Ala.Code Sections 7–2–309(2) and (3) (1975). Without treating the issue in too much more detail, it is clear that a majority of other jurisdictions would also apply the Uniform Commercial Code to exclusive distributorship agreements. *See, e.g., Division of Triple T. Service, Inc. v. Mobile Oil*

*Corp.*, 60 Misc.2d 720, 727, 304 N.Y.S.2d 191 (1969), *aff'd*, 34 A.D.2d 618, 311 N.Y. S.2d 961 (2d Dep't 1970); *see Leibel v. Raynor Mfg. Co.*, 571 S.W.2d 640, 642 (Ky. App.1978); *see, e.g., DeFilippo v. Ford Motor Co.*, 516 F.2d 1313 (3rd Cir.) (interpreting the Pennsylvania version of the code), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975); *and Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 394, 454 A.2d 367 (1983), *as well as Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (1979) (Wisdom, J.) (applying Iowa law) (*citing Rockwell Eng'g Co. v. Automatic Timing & Controls Co.*, 559 F.2d 460 (7th Cir. 1977), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979); *Aaron E. Levine & Co. v. Calkraft Paper Co.*, 429 F.Supp. 1039 (E.D.Mich.1976); *and Baker v. Ratzlaff*, 1 Kan.App.2d 285, 564 P.2d 153 (1977)); *see also Babst v. FMC Co.*, 661 F.2d 82, 87–88 (S.D.Miss.1986) under (Mississippi law the UCC governs distributorship agreement); *Muese–Rhine–Ijssel Cattle Breeders of Canada, Ltd. v. Y–Tex Corp.*, 590 P.2d 1306, 1309 (Wyo.1979) (applying UCC provisions to exclusive distributorship agreement). *But see Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 358 N.W.2d 845, 847–47 (1984); *Tile Craft Products Co., Inc. v. Exxon Corp.*, 581 S.W.2d 886, 889 (Mo.App.1979) (Missouri law) *and Vigano v. Wylain, Inc.*, 633 F.2d 522, 525 (8th Cir.1980) (interpreting Missouri law), for the contrary proposition.

Further, in poring over the New Jersey Uniform Commercial Code, the accompanying New Jersey study comments cite approvingly to *Mantell v. Int'l Plastic Harmonica*, 141 N.J.Eq. 379, 55 A.2d 250 (1947) (a case involving an exclusive distributorship agreement). *See, e.g.,* N.J.Stat. Ann. Sections 12A:2–204 *and* 12A:2–306 study comments.

Particularly, the study comment to Section 12A:2–204 explains *Mantell,* stating:

"In that case a manufacturer agreed to supply a distributor with its total output of harmonicas up to a certain maxima, 'at the lowest price and with the highest discount'

given to any other distributor in the United States. The manufacturer subsequently selected another distributor, contending that the contract was unenforceable because of lack of definiteness. The court held the contract was enforceable. In articulating the rule of the case, the court took a dim view of the defense of lack of definiteness where commercial contracts are involved. The holding indicates that the adoption of sections 2–305 (open price), 2–306 (output and requirements), 2–311 (options and cooperation respecting performance), and subsection 2–204(3) of the Code would not result in changing New Jersey law."

The clear import of this portion of the comment is that New Jersey courts should follow the majority and apply the provisions of its version of the UCC to questions concerning exclusive distributorship agreements. Accordingly, I will adhere to the majority rule and apply the UCC provisions to the instant action, supplemented, of course by New Jersey common law where appropriate. *See* N.J.Stat.Ann. Section 12A:1–103.

## 1. CONTRACT

The first substantive issue to be treated with respect to these cross-motions for summary judgment is whether the parties have formed a contract. In this regard, the N.J.U.C.C. provides:

"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

"(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." N.J.Stat.Ann. Section 12A:2–204; *see Truex v. Ocean Dodge, Inc.*, 219 N.J.Super. 44, 50–51, 529 A.2d 1017 (App.Div.1987).

Under the New Jersey courts' interpretation of the UCC, "the essentials of a valid contract are mutual assent, consideration, legality of object, capacity of the parties and formality of the memorialization." *Cohn v. Fisher*, 118 N.J.Super. 286, 291, 287 A.2d 222 (Law Div.1972). It appears from the record before me, that in attacking the existence of the contract, the defendant focuses on (1) mutual assent and (2) formality of the memorialization.

██ With respect to mutual assent, Alfin has argued, that the telexes between the parties do not evidence a meeting of the minds. The defendant contends that prior to September 23, 1986, there had been only one telephone call between the plaintiff and himself, and that, as of this time, no exchange of pertinent sales information had taken place. Mr. Alfin contends that his September 29, 1986 telex, wherein he stated that "our understanding is that you will be the exclusive distributor for the domestic market in Iceland" indicates that Mr. Alfin was merely negotiating with an eye towards a future contractual relationship, rather than evincing assent to a present agreement. Further, Mr. Alfin points out that the facts that (1) the plaintiff did not supply a marketing plan including points of sale and order quantity, and (2) that the defendant did not, as yet, inspect the plaintiff, further demonstrates the lack of mutual assent.

New Jersey law is clear that when assessing mutual assent under a contract governed by the UCC, an objective theory applied by all other jurisdictions is followed—that is, "a contracting party is bound by the apparent intention he outwardly manifests to the other contracting party. To the extent that his real, secret intention differs therefrom, it is entirely immaterial." *Cohn, supra*, 118 N.J.Super. at 291, 287 A.2d 222. *See also Friedman v. Tappan Development Corp.*, 22 N.J. 523, 531, 126 A.2d 646 (1956) ("It is not the real intent, but the intent expressed or apparent in the writing that controls"); *Looman Realty Corp. v. Broad Street Nat'l Bank of Trenton*, 74 N.J.Super. 71,

**156**

82, 180 A.2d 524 (App.Div.1962) ("In the usual case where the meaning of the language used is unambiguous, a mental reservation of a party as to the effect of his words is not material"), *cert. denied,* 37 N.J. 520, 181 A.2d 782 (1962).

Taking a close look at the two September telexes, I conclude that a reasonable juror could only reach one conclusion—that is, on September 29, 1986, the defendant manifested its assent to the contract under the standard articulated above.

The September 29 telex provided rough price information, information concerning the goods, and how advertising and display material would be charged. The letter also asked for points of sale and opening orders. Finally, the letter stated, "I look forward to a pleasant and mutually profitable arrangement. Our understanding is that you will be the exclusive distributor for the domestic market in Iceland." This letter clearly indicates to me, without resort to an explanation of the defendant's subjective intent which is nevertheless immaterial under the governing law, that the defendant assented to the plaintiff becoming its exclusive distributor in Iceland. Why else ask for opening orders from the plaintiff? Why else voice one's pleasure at entering a pleasant and *mutually* profitable venture? Why else inform the plaintiff "that you will be the exclusive distributor?" There can be but one answer—the defendant assented to the exclusive distributorship agreement.

Also, with respect to mutual assent, it is of interest to note that the plaintiff wrote in its September 23, 1986 telex to the defendant, that "we are very excited to be the exclusive distributors for these products in Iceland." This language again indicates to me but one conclusion—that the plaintiff thought she was the exclusive distributor. The September 29, 1986 telex from Mr. Alfin, did nothing to dissuade the plaintiff of the notion that it was the exclusive distributor in Iceland. In fact, to the contrary, the defendant's telex confirmed the fact, stating, "our understanding is that you will be the exclusive distributor for the domestic market in Iceland." The

New Jersey U.C.C. calls for no more proof of mutual assent than this. *See* N.J.Stat. Ann. Section 12A:2–204 (a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract); *see also Cohn,* 118 N.J.Super. at 291, 287 A.2d 222.

■ With respect to proper memorialization, the defendant contends that since the September 29, 1986 telex contains "none of the contractual terms," (particularly, the quantity term) the September 29, 1986 telex does not satisfy the UCC statute of frauds provision.

N.J.Stat.Ann. Section 12A:2–201(1) provides:

"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

This provision allows for the omission of otherwise material terms in a contract under the UCC. In this regard, Comment No. 3 to Section 2–201 section, cited in part by the defendant in its supplemental memorandum of law, at 15, explained how the UCC changed the New Jersey anti-memorandum rule—a rule which held that memoranda which omitted material terms, but yet indicated agreement, could not demonstrate the existence of a contract. The comment revealed:

"Subsection 2–201(1) would change this New Jersey law. Under the subsection 'A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.'

"This provision (of the Code) is consistent with other sections of the U.C.C. which refuse to make contracts unenforceable because certain material terms are omitted, such as sec. 2–305 relating to open price contracts, ... section 2–306 relating to output, requirements and exclusive dealings contracts, ... and section 2–311 relating to contracts leaving the particulars of performance to be specified by one of the parties.... If these terms may be omitted from an enforceable written contract, and there are good reasons why the law should permit their omission, it would be strange to require their inclusion in a memorandum which, by definition, seems to connote something less inclusive than the contract it purports to represent. Subsection 2–201(1) proceeds on the theory that any memorandum should be sufficient for purposes of satisfying the Statute of Frauds if it reasonably proves the existence of a contract obliging the defendant to buy or sell goods, and shows enough of the contractual terms to assure a reasonably certain basis for giving appropriate relief to the parties. Reasonable proof of the existence of a contract obligating the defendant to buy or sell goods is assured by the requirements of the subsection that the memorandum must be 'some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.' And assurance that there is a reasonably certain basis for providing appropriate relief is found in the provision that the contract is not enforceable 'beyond the quantity of goods shown in such writing' (memorandum). Given the quantity term of contract, a court can fairly construct the omitted terms of the contract, such as price, terms and place of payment, time and place of delivery, etc., and, by constructing these terms, adjudicate the matter more justly than would be the case were it simply to declare the contract unenforceable. See, Hawkland, Sales and Bulk Sales Under the Uniform Commercial Code, 26–27 (1958)."

Accordingly, I do not believe that the omission of material terms in any way affects the contract's validity under the statute of frauds. This is particularly apt for terms such as the price and quantity of goods in an exclusive distributorship agreement. The *Mantell* court, whose decision, as I stated earlier, is approved in the New Jersey comments to the Uniform Commercial Code, explained why this was the case when it reasoned as follows:

"This type of contract is a comparatively recent device to meet modern needs in the marketing and distribution of goods on a nation-wide or regional scale. In the very nature of the exclusive sales and distribution contract, it is not usually practicable to fix prices and the *quantum* of goods sold; and the rules of certainty and definiteness which govern the ordinary contract of sale have no application. Unlike a pure contract of purchase and sale, agreements of this class embody mutual promises and obligations with sufficiently definite standards by which performance can be tested. The grant of the exclusive franchise is a consideration for the grantee's obligation to establish and develop a market for the sale and distribution of the product in the area covered by the monopoly. The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices. This is especially so where, as here, the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities. Such contracts have the requisite mutual assent and consideration. They are not comparable to the ordinary executory agreement to buy and sell goods....

"Contracts of this category are to be given a practical interpretation that will effectuate and not defeat the common intention in an area of conventional action that, due to unpredictable market conditions, production factors, and so on, ordinarily does not permit of greater certainty and definiteness in the particulars mentioned."

141 N.J.Eq. at 389, 55 A.2d 250 (citations omitted).

It is undisputed from the evidentiary materials before me in this action that the

purported exclusive distributing agreement here was an agreement granting plaintiff commercial dominion over a territory. This is also known as an exclusive territory contract. Chancellor Hawkland has explained such agreements in his treatise, stating,

"The exclusive territory contract is a variant of the requirements contract. The buyer is given the exclusive right to sell the product of the seller in a described territory."

2 W. Hawkland UCC Series Section 2–306:3 (Art. 2) (1982). *See also* 2 R. Anderson, Uniform Commercial Code Section 2:306:42, at 530 (1982) ("The exclusive dealings contract will typically be a requirements contract as well").

As such, I believe that UCC section 2–306 applies to this action. Accordingly, were I to rule otherwise on the statute-of-frauds issue, then I would effectively negate the effect of section 2–306 in this action. That section provides that

"(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded;

"(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."

This section is essentially a codification of the *Mantell* court's observation that it would be unfeasible to fix quantity terms in distributorship arrangements. In the place of fixed quantity, the legislature has instead imposed this "best efforts" duty. As UCC Section 2–306 Comment 5 explains:

"5. Subsection (2), on exclusive dealing, makes explicit the commercial rule embodied in this Act under which the parties to such contracts are held to have impliedly,

even when not expressly, bound themselves to use reasonable diligence as well as good faith in their performance of the contract. Under such contracts the exclusive agent is required, although no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be. The principal is expected under such a contract to refrain from supplying any other dealer or agent within the exclusive territory. An exclusive dealing agreement brings into play all of the good faith aspects of the output and requirement problems of subsection (1)."

Courts and commentators who have confronted the problem of an indefinite quantity term, have recognized these considerations and held that an indefinite quantity term does not support the invalidation of a contract. *See Gestetner Corp. v. Case Equipment Co.*, 815 F.2d 806, 810–811 (1st Cir.1987); *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir.1983) ("Justice would be thwarted by denying enforceability upon the basis of a lack of a specific quantity. The code was enacted to prevent just such an inequitable result."); 2 R. Anderson, *supra*, Section 2–306:42, at 530 ("Following the view that the Code does not require the statement of any quantity in a requirements contract, it has been held that the statute of frauds does not require the statement of quantity in an exclusive dealings contract"); 2 W. Hawkland, *supra*, Section 2–306:02, at 223 ("In short, in open-ended output or requirements contracts where the particular party to determine the quantity has no 'track record,' the courts must do the best they can in working out a fair and reasonable quantity term. This assignment is a difficult one, but can no longer be avoided by resort to the doctrines of 'lack of mutuality,' 'lack of definiteness,' or 'illusion' ").

In sum then, since I conclude that there are no genuine issues of material fact with respect to mutual assent and with respect to memorialization, and since I further conclude that, as a matter of law, the plaintiff's position is correct with respect to mutual assent and memorialization, it is undisputed that under the relevant New

Jersey commercial precepts an exclusive distributorship agreement existed between the parties.

## 2. TERMINATION AND NOTICE

Second, the defendant has argued, alternatively, that even were there a contract in this instance, it was terminable at will because there was no express duration and/or termination provision in the contract. Again, to determine this issue, in the context of summary judgment, I revert to the New Jersey U.C.C. The Code's relevant section provides:

"(1) The time for shipment or delivery or any other action under a contract if not provided in this Chapter or agreed upon shall be a reasonable time.

"(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

"(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable."

According to Professor Anderson

"an indefinite duration contract is a contract that calls for repeated performances that are to be repeated indefinitely into the future; such as, to deliver a stated quantity of coal to the buyer's factory in the first week of each month or to furnish the buyer's requirements." 2 R. Anderson, *supra*, Section 2–309:12, at 548. Here, both sides agree that no term for duration and/or termination was ever arrived at. I have found from undisputed evidence that an exclusive distributorship agreement did exist between the parties. Since no duration was contemplated, the contract must have been one for an indefinite term.

As such, although not citing the Code, the defendant indicates that the agreement was terminable at will, without advance notice. The plaintiff, for its part, argues that the defendant could not terminate the contract for a commercially reasonable time. Specifically, the plaintiff argues that the defendant never gave it the chance to perform under the contract. It submits that the defendant was duty-bound to allow the plaintiff to perform for a reasonable time before the defendant could even think of terminating the plaintiff. Accordingly, per the plaintiff, the defendant's action was not a termination of the agreement, but rather a breach of the agreement. Further, the plaintiff contends that it did not receive reasonable notification of the purported termination of the agreement. This, too, it submits, was a breach of the agreement.

Again, under the UCC, according to Professor Anderson,

"When a continuing contract does not contain any terms specifying the duration of the contract, it continues for a reasonable time, but may be terminated at any time, *without regard to whether a reasonable time has already expired,* [*citing* for this proposition *Clear Lake City Water Authority v. Clear Lake Utilities Co.,* 549 S.W.2d 385 (Tex.1977) *and Rockwell Eng'g Co. v. Automatic Timing & Controls Co.,* 559 F.2d 460 (7th Cir.1977) ], by one party upon the giving of reasonable notice." 2 R. Anderson, *supra*, Section 2–309:15, at 549 (footnotes partially included *and* partially omitted).

Hence, it is clear that the defendant could have terminated the agreement at any time prior to the elapsing of a reasonable time unless such termination was unconscionable or would impose hardship on the plaintiff. *See* 2 R. Anderson, *supra*, Section 2–309.16, at 550; *see also* 2 W. Hawkland, *supra*, Section 2–309:03, at 245. Such questions of unconscionability or hardship are clearly questions for the trier of fact in this instance. However, I believe that these questions need not be answered in this instance, for other undisputed facts clearly reveal that the plaintiff is entitled to its motion for summary judgment as to liability.

According to N.J.Stat.Ann. Section 12A:2–309(3), "[t]ermination of a contract by one party ... requires that reasonable

notification be received by the other party." Comment 8 to U.C.C. Section 2–309 explains:

"Subsection (3) recognizes that the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement."

Further, Professor Anderson explained:

"In view of the fact that UCC Section 2–309(3) requires that 'reasonable notification be received by the other party' it is clear that 'reasonableness' does not relate to the mechanics of notice but to circumstances under which the notice is given and the extent of advance warning of termination that it gives. This construction is further supported by the general requirement of good faith. The requirement that reasonable notification be given is not restricted to the manner of giving notice but requires that it be given a reasonable time in advance of the actual termination date."

2 Anderson, *supra*, Section 2–309:18, at 551.

With respect to distributorship agreements, he specifically stated:

"The reasonableness of notice of termination in the case of a distributorship contract would 'seem to hinge closely upon the amount of time necessary to enable the distributor to look for a new source of supply.'"

*Id.* at 551 & n. 12 (*citing Aaron E. Levine & Co., supra*, 429 F.Supp. at 1039); *see also Bak-a-Lum Corp. v. Alcoa Bldg. Prod.*, 69 N.J. 123, 129, 351 A.2d 349 (1976) (notice to terminate distributorship must be reasonable).

Assuming, that Mr. Alfin's January 19th telex constituted a notice of termination, the notice could not possibly be reasonable under any reading of the evidentiary materials put before me. A reading of the authorities interpreting the Section 2–309(3) of the Code, as I have done above, indicates to me that the following is necessary to provide reasonable notice of termination: notice must be given a reasonable time in advance of termination—specifically, with respect to distribution agreements, the notice must give the buyer reasonable time to find other arrangements. Here, the record is clear that no time elapsed between the telex notice and the termination. The telex reflects that the plaintiff had no further arrangement with the defendant as of the time the plaintiff read the telex. Since the telex provided *no time* between notice and termination, there is no factual issue as to whether the length of time was or was not reasonable. Since notice of termination and termination occurred simultaneously, there was no chance for the plaintiff to make alternate arrangements or close its affairs in an economically proper manner in the interim. *See* Section 2–309, Comment 8. This telex from the defendant was therefore an unreasonable notice of termination.

I am well aware that determinations of reasonableness are usually left for the trier of fact. Here, however, where the facts indicate no time lapse between notice and termination, I believe that a reasonable trier of fact could only come to one conclusion—that the defendant did not provide reasonable notice and was therefore in breach of his duty under the agreement as supplemented by the provisions of the New Jersey U.C.C. *See Anderson, supra*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12 (where evidence is so one-sided as to evince but one conclusion, summary judgment may issue). Hence, I will grant the plaintiff's motion for summary judgment as to liability.

I note, before concluding, that the defendant has also contended, with respect to damages, that the plaintiff should not receive its reliance damages for the loss that it suffered for employing an employee under a one-year irrevocable employment agreement. The defendant asserts that this reliance was allegedly unreasonable. It appears to me that the reasonableness of this reliance should be assessed by the trier of fact as to damages, because the materials before me at this time could fairly produce two different outcomes. Accordingly, this aspect of the defendant's motion

for summary judgment, as well its motion for summary judgment concerning its non-liability, is denied.

## CONCLUSION

For the reasons stated before above, I will grant the plaintiff's motion for summary judgment as to liability under the U.C.C. and deny the defendant's motion for summary judgment as to nonliability and damages.