97 N.J. Super. 246 (1967)
234 A.2d 737
A.J. ARMSTRONG CO., INC., PLAINTIFF,
v.
JANBURT EMBROIDERY CORP., HARRY JOSEPHS, BERNARD JOSEPHS, GEORGE JOSEPHS, AND JAMES LO CURTO, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 6, 1967.
*252 Mr. Thomas A. Hogan for plaintiff (Moser, Roveto & McGough, attorneys).
Mr. Joseph V. Cullum for defendants.
PINDAR, J.S.C.
This is an action brought by the assignee of a promissory note, secured by a chattel mortgage, for a deficiency judgment against certain alleged accommodation parties to the note. A judgment of liability against Janburt, the maker of the note, has already been entered. The question of the extent of the parties' liability on the note has been severed from the present action, which is solely concerned with the liability of the alleged accommodation parties. R.R. 4:43-2. The following facts are not in dispute:
On March 1, 1960 defendant, Janburt Embroidery Corp. (Janburt) obtained a loan from Robert Reiner, Inc. (Reiner), in return for which Janburt executed 72 negotiable promissory notes payable to Reiner's order at stated monthly intervals. The notes were secured by a chattel mortgage on certain pieces of machinery owned by Janburt. The signatures of codefendants James Lo Curto, Bernard Josephs, George Josephs and Harry Josephs (not served in this action) appeared on the reverse side of each of the 72 notes. The following statement appeared immediately above the aforesaid signatures: "We hereby waive notice of protest, presentment and dishonor."
In January 1963 John A. Vollman, now president of Reiner, purchased a majority stock interest in Reiner, Inc. This purchase was financed by A.J. Armstrong and Co. (Armstrong), plaintiff herein, a New York corporation. As part of the consideration for Armstrong's financing of Vollman's *253 purchase, a general assignment of accounts receivable including, presumably, the chattel paper which is the basis of this suit, was made to Armstrong. Reiner, however, was to continue to collect the moneys due under the assignment. It does not appear whether the general assignment represented a sale of Reiner's accounts receivable or simply the creation of a security interest in them.
In January 1963 Janburt asked Reiner to refinance their notes of 1960. Each of these notes was drawn for $805.55, representing monthly repayments of principal and interest at 6%. Pursuant to Janburt's request Reiner drew a "refinance note" in April 1963, but dated May 15, 1963. The refinance note provided that $38,400, the unpaid balance due under 1960 series of notes, was to be repaid in 48 monthly installments of $510.02, with a final "balloon" payment of $24,849.15. The refinance note was to bear an annual interest rate of 8 1/2%.
The refinance note contained the following statements in two separate paragraphs:
"1. Upon failure to make any payment as herein agreed, or in the event of death, insolvency or bankruptcy or failure in business of the maker, this note shall, at the option of the holder immediately become due and payable without demand or notice * * *.
2. The undersigned hereby waives notice of nonpayment, protest, presentment and demand * * *."
At the bottom of the refinance note appeared the typed signature of Janburt Embroidery Corp., by James Lo Curto, president. Attesting was Harry Josephs, as secretary of Janburt. The signatures of Bernard Josephs and George Josephs, the former above the latter, appeared immediately beneath that of Harry Josephs. On the reverse side of the refinance note all four signatures appeared with the signatories' respective addresses. No corporate offices appeared after any of these signatures.
Vollman testified that this note with its individual endorsements was not received by him until November 11, *254 1963, at which time it was forwarded to Armstrong accompanied by Reiner's assignment.
Subsequent to the drawing of the refinance note a so-called "Extension Agreement" was drawn between Janburt (mortgagor), Reiner (mortgagee) and Armstrong. The extension agreement was dated June 1963. It purported to amend the terms of the chattel mortgage executed between Janburt and Reiner and assigned by Reiner to Armstrong. Among other provisions the agreement provided:
"* * * 1. The mortgagor shall be and hereby is indebted to Armstrong in the amount of $38,813.05.
2. Said indebtedness of $38,813.05 shall be payable as follows: $413.05 upon signing of this extension agreement and the balance of $38,400 in 48 equal monthly installments of $510.02 each and a 49th and final installment of $25,025.16 * * *."
It should be noted that the extension agreement increased Janburt's total indebtedness by more than $400 over the total in the refinance note of May 1963. The extension agreement was signed:
 "WITNESS OR ATTEST:
 GEORGE JOSEPHS (S)
 JANBURT EMBROIDERY CORP.
 (Mortgagee)
 BY: JAMES LO CURTO (S)
 BY: BERNARD JOSEPHS (S)
 BY: HARRY JOSEPHS (S)"
In a letter from Reiner to Lo Curto, dated November 6, 1963, Vollman asked:
"Please have each of the four stockholders repeat their name on the back of this note (i.e., May 15, 1963) indicating that they are personally liable for the note in question.
Also please have two officers of Janburt Embroidery sign the three copies of the extension agreement where indicated and after the names and signature of A.J. Armstrong Co. please have all four stockholders sign as individuals in the spaces provided. * * *"
*255 Again, on November 14, 1963 Vollman wrote to Janburt:
"* * * Will you also please be kind enough to remind Mr. Joseph to return the underlying extension agreement on which the four stockholders have to affixe [sic] their signatures as individuals."
The extension agreement was finally received by Reiner on or about November 18, 1963, at which time it was forwarded to Armstrong. Throughout Vollman's correspondence with Janburt it appears that Reiner was acting as Armstrong's agent.
Subsequent to the execution of the refinance note and extension agreement Janburt made payments directly to Armstrong. On March 15, 1964 there was a default. As provided by the terms of the refinance note, the entire balance was accelerated. The security specified in the chattel mortgage was sold at sheriff's sale on March 17, 1965 and purchased by Reiner for $100.

I
Both counsel stipulated that the law of New Jersey applies to this action.
The refinance note and extension agreement involved in this suit for deficiency are governed by the Uniform Commercial Code, as adopted by the New Jersey Legislature. The Code became operative on January 1, 1963. The parties must be presumed to have contracted in light of the law as it existed in 1963. Since the extension agreement purports to amend the 1960 chattel mortgage, it is presumed that those portions of the mortgage not so amended were satisfactory to the parties in light of the law at the time of their modifications. N.J.S. 12A:10-101(3). Therefore, the rights and liabilities of the parties under their security agreement (chattel mortgage) are also to be governed by N.J.S. 12A:1-101 et seq., especially N.J.S. 12A:9-101 et seq., and insofar as applicable, N.J.S. 12A:3-101 et seq.

*256 II
By its terms N.J.S. 12A:9-101 et seq. governs the general assignment between Reiner and Armstrong of January 1963. Article 9 applies to any transaction which creates a security interest in or which is a sale of chattel paper. N.J.S. 12A:9-102(1)(a) and (b). Chattel paper is defined as "writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods. When a transaction is evidenced both by such a security agreement * * * and by an instrument or a series of instruments, the group of writings taken together constitute chattel paper." N.J.S. 12A:9-105 (1) (b). The term "instrument" means a negotiable instrument. N.J.S. 12A:9-105(1) (g). Thus, in the suit under discussion the three writings  the refinance note of 1963, the chattel mortgage executed in 1960, and the extension agreement dated June 1963  constitute chattel paper. See Uniform Commercial Code, N.J.S. 12A:9-105 Comment 3, "Chattel Paper" (p. 345).
Thus, whether Armstrong bought the chattel paper or merely took a security interest in the subject chattel paper, Armstrong is treated as a secured party under Article 9. N.J.S. 12A:9-105(1) (i) defines a secured party as one to whom chattel paper has been sold. In these circumstances, Janburt is termed the "account debtor" and Reiner the "debtor." However, Article 9 does not purport to deal with an assignee's right to dispose of collateral owned by an account debtor and subsequently to sue the account debtor for a deficiency. N.J.S. 12A:9-504(2) refers to the rights between an assignor and his assignee and is inapposite for disposition of this issue. But under general principles of law of assignment, the assignee succeeds to all the rights of his assignor. If Reiner could dispose of collateral and sue for deficiency, Reiner's assignee, Armstrong, could do so as well. In some situations, not here relevant, the assignee *257 of chattel paper will have greater rights than his assignor. See N.J.S. 12A:9-318(1).
Article 9 provides that a secured party may reduce his claim to judgment, foreclose, or otherwise enforce the security interest by any available judicial procedures as prescribed by individual state laws. N.J.S. 12A:9-501(1). According to New Jersey Study Comment # 3 to 9-501, such procedures are covered by the Rules of Civil Procedure. However, in Veterans Loan Authority v. Wilk, 61 N.J. Super. 65 (App. Div. 1964), the court indicated that the Chattel Mortgage Act did not prescribe procedures for the foreclosure of security interests in chattels other than consumer goods. This act has since been repealed by the adoption of the Uniform Commercial Code. No procedures can be found either in the code or otherwise which govern the foreclosure and subsequent deficiency actions for security interests in equipment. However, since the first sentence of N.J.S. 12A:9-502(2) makes it clear that the debtor, unless otherwise agreed, is liable for the deficiency after the collateral has been disposed of by the secured party, the present action is properly before the court. Therefore Armstrong, as Reiner's assignee of both the refinance note and chattel mortgage, is entitled to a deficiency judgment absent any valid defenses, the merits of which are examined below.

III
Defendants allege that the extension agreement was in fact a novation which discharged their liability as accommodation parties to the refinance note dated May 15, 1963. The court assumes that by using the term "novation" defendants mean to say that the extension agreement embodied their total obligations to Armstrong, if any, and further, that the agreement was executed in satisfaction for and payment of all prior notes and obligations, thus releasing Janburt and, ipso facto, releasing the accommodation parties. Except insofar as Article 9 may supersede the provisions *258 of Article 3, the latter governs the rights and liabilities of the parties to the refinance note because the note is negotiable in form and promissory in nature. See Uniform Commercial Code Comment # 3 to N.J.S. 12A:3-103. There are, therefore, two questions for this court to consider, viz., (1) does the execution of a second promissory note or agreement automatically discharge a prior promissory note, and (2) if it does so discharge the prior note, does such discharge affect the liability of the accommodation parties to the first note. No New Jersey cases appear to have decided these two points. See New Jersey Study Comment # 2 to N.J.S. 12A:3-606. But see Meginnis v. Nightingale, 34 N.J.L. 461 (1871); Martin v. Bell, 18 N.J.L. 167 (1840).
"The rule obtaining in most jurisdictions is that in the absence of an agreement or understanding to such effect, the acceptance by the holder of a negotiable bill or note of a renewal or new bill or note in place thereof does not of itself constitute a payment of the original instrument." 10 C.J.S. Bills & Notes § 444, p. 976.
Phrased differently:
"[T]he acceptance of a new obligation is not satisfaction of an existing note or judgment unless so intended. * * * No novation results in the absence of specific proof to that effect." Olyphant Bank v. Borys, 155 Pa. Super. 49, 36 A.2d 823, 824 (1944).
These statements indicate that the execution of a second note is simply one factor among many to consider when determining whether or not the parties intended to discharge their obligations on a prior note. Without more, therefore, the extension agreement did not discharge the refinance note. However, in the present case it is unnecessary to determine whether the surrounding circumstances support a finding of novation for two reasons. First, Janburt's liability is admitted in the pleadings and judgment entered accordingly. Secondly, even if a novation were effected between Janburt and Armstrong, the Uniform Commercial Code clearly indicates that the accommodation parties may nevertheless remain liable on the refinance note. N.J.S. 12A:3-606(1) (a), insofar as it is pertinent, reads as follows:
*259 "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person * * *. (emphasis added)
Assuming that the phrase "otherwise discharges" includes novation, this section nevertheless indicates that secondary parties on the instrument to be discharged may remain liable on it in either one of two ways. First, the secondary parties, including accommodation indorsers, may consent to the novation. Second, without the accommodation indorsers' consent to the novation, they may remain liable on the instrument if the holder expressly reserves his rights against them. A recent New York case is instructive on the first point. (Parenthetically, it should also be noted that the policy of the New Jersey Legislature in adopting the Uniform Commercial Code is that the courts of this State are to consciously attempt to give the Code a uniform interpretation not only as between our courts but also with those of other states wherever possible. N.J.S. 12A:1-102(2)(c). Therefore sister-state interpretations of the Code are more than mere persuasive authority.)
In London Leasing Corp. v. Interfina, 53 Misc.2d 657, 279 N.Y.S.2d 209 (Sup. Ct. 1967), Interfina executed a negotiable note payable to London and indorsed by Interfina's president for accommodation. Subsequently, the president of Interfina executed an extension agreement with London but he did not sign this agreement in his individual capacity. Upon default London sued on the original note, joining the president as co-defendant in his capacity as an accommodation indorser. The president defended, as do the codefendants in this case, by claiming that the extension agreement discharged his obligation as surety on the original note, citing section 3-606 of the code. But the court focused upon the word "consent" and said *260 that consent need not be expressed but can be implied from the circumstances. Since the president had applied for, negotiated and signed the extension agreement in his corporate capacity, he was held to have consented to the extension of time for the payment of the original note, and therefore was not discharged.
Inasmuch as Lo Curto, Bernard Josephs and George Josephs were involved in the negotiations for their extension agreement, and further, signed the agreement, it is fair to conclude that they consented to its execution and effect and cannot now assert that since the agreement released Janburt on the refinance note, they are therefore also released. Furthermore, the letters from Vollman to Lo Curto and Janburt, quoted supra, clearly indicate Armstrong's intent to hold defendants individually liable on both the refinance note and the extension agreement. Armstrong was, in effect, expressly reserving its rights against defendants on the refinance note.
There is one additional question regarding the application of N.J.S. 12A:3-606. Since that section applies on its face to a "holder," the question is whether it should have any application to one who could be but is not a holder. The refinance note which is the basis of this suit is made payable to Reiner but does not show Reiner's indorsement. It is undisputed, however, that Armstrong is a transferee for value by virtue of Reiner's assignment. This fact entitles Armstrong to Reiner's unqualified indorsement which would make Armstrong the "holder". N.J.S. 12A:3-201(3); 12A:1-201. In this factual setting there is no reason or logic for denying the application and operation of section 3-606, although the court does not express any opinion whether a similar result would be reached in different circumstances.
Because the refinance note does not clearly indicate the capacity in which the co-defendants signed for Janburt's accommodation, their signatures must be deemed indorsements. N.J.S. 12A:3-402. Their liability to Armstrong does not depend upon Armstrong's status, whether holder in due course, holder, or mere transferee. James Talcott, Inc. *261 v. Fred Ratowsky Assoc., Inc., 84 Dauphin 258, 38 Pa. Dist. & Co. R.2d 624 (Pa. C.P. 1965), interpreting section 3-415 of the Code.

IV
The second defense raised by counsel in order to release the accommodation indorsers from personal liability is that plaintiff failed to give notice of nonpayment, protest and presentment. There is no legal merit to this contention for several reasons. First, there is an express waiver of notice contained in the body of the refinance note and reproduced supra. The waiver appears not once but twice. N.J.S. 12A:3-511 (2) (a) expressly provides that presentment or notice or protest, as the case may be, is entirely excused when the party to be charged has waived it expressly or by implication, either before or after it is due. New Jersey Study Comment # 1 to N.J.S. 12A:3-511 (2) (a), and cases cited therein, states that where such a waiver is stated on the face of the instrument, it is binding on all parties.
Second, N.J.S. 12A:3-511(2)(b) states that notice is unnecessary and excused when the party has no reason to expect that the instrument will be paid. Lo Curto, as president of Janburt, and Bernard Josephs as treasurer, certainly knew that there was default on the refinance note and that the corporation could not pay it. As to them notice was unnecessary.
Third, N.J.S. 12A:3-606(1) (a) expressly provides that failure to give notice of dishonor does not discharge an accommodation party as to whom such notice is unnecessary. Was notice necessary for George Josephs? As a stockholder in a closed corporation he certainly should have known of the foreclosure and the preceding default on the refinance note. Notice to him would be a mere formality, as it would be to Lo Curto and Bernard Josephs, who as officers of Janburt, were charged with knowledge of the corporate affairs, especially its financial posture.

*262 V
The third defense raised by counsel for the accommodation indorsers is that of usury. There is no room for dispute that Janburt cannot raise the defense of usury. N.J.S. 31:1-6. Can it be raised as a defense by accommodation indorsers of a concededly valid corporate obligation? A recent Pennsylvania case relying on the authority of Vice-Chancellor Bigelow in General Motors Acceptance Corp. v. Larson, 110 N.J. Eq. 305, 310 (Ch. 1932), answered the question in the negative. Raby v. Commercial Banking Corp., 208 Pa. Super. 52, 220 A.2d 659 (Super. Ct. 1966). The Pennsylvania statute was in all pertinent particulars like that of New Jersey. The court held that accommodation endorsers could not avail themselves of the defense of usury if they guaranteed a true corporate obligation. To the same effect, Ferdon v. Zarriello Bros., Inc., 87 N.J. Super. 124, 129 (Law Div. 1965), and cases cited therein. Thus the defense of usury is not grounds to defeat recovery on the refinance note.

VI
It is not clear whether defendants' fourth defense goes to the question of liability or damages. First, defendants allege that plaintiff acted in bad faith and, secondly, that the foreclosure sale was commercially unreasonable. There has been no evidence to support the first point. On the second point, there is nothing to support defendants except Lo Curto's affidavit that plaintiff took steps to prevent open competitive bidding. N.J.S. 12A:9-504(1), (2) and (3) clearly gives the secured party the right to sell the collateral by public or private sale. The standard is commercial reasonableness. If defendants can prove what steps were taken to chill the bidding, N.J.S. 12A:9-507(1) gives the debtor or any person entitled to notification a right to recover from the secured party any loss caused by said action. But since plaintiffs credit defendants with the apparent *263 fair market value of the security, it does not appear what loss defendants are sustaining. Thirdly, defendants allege that they received no notification of the sheriff's sale. N.J.S. 12A:9-504(3) provides that only the debtor (Janburt) or other secured party need receive notice. The only testimony in this trial on this point is to the effect that Vollman told Lo Curto that the sale would take place in two weeks. N.J.S. 12A:1-201(26) states that a person "receives" notice or notification when it comes to his attention. N.J.S. 12A:1-201(30) defines "person" to include an individual or organization. N.J.S. 12A:1-201(28) defines organization to include a corporation. Lo Curto, as president of Janburt, received notice from Vollman of the impending sale. Under ordinary agency principles this knowledge must be charged to the corporate debtor.
Therefore, the court concludes that defendants are personally liable as accommodation endorsers on the refinance note dated May 15, 1963. Accordingly, the trial shall continue for a determination of the extent of that liability.