OPINION
SMITH, Circuit Judge.
This case is about missing insurance premium payments. Lincoln General Insurance Co. (“Lincoln General”), an insurance company, never received insurance premium payments from certain policyholders (the “Policyholders”). AMGRO, Inc. (“AMGRO”), an insurance premium financing company, paid the Policyholders’ premiums to David MacGregor Co. (“MacGregor”), the Policyholders’ retail insurance broker, which retained its agreed upon commission and then sent the remaining funds to Northern Financial Group, Inc. (“Northern Financial”), Lincoln General’s wholesale insurance agent[1] for the transactions. Under normal circumstances, Northern Financial would then have sent payment to Lincoln General. But the insurance premium payments never arrived at Lincoln General and this litigation ensued. Lincoln General, MacGregor, and MacGregor’s risk management consultant, Mark Grossbard, now seek review of the District Court’s determinations of several motions for summary judgment. After reviewing the record, we conclude that the District Court correctly decided the summary judgment motions and will affirm its judgment.
The District Court had jurisdiction over this case under 28 U.S.C. § 1332(a) and we review its grant of summary judgment under 28 U.S.C. § 1291. We exercise “plenary review over the District Court’s grant of summary judgment.” Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir.2005) (internal quotation omitted). A court should grant summary judgment “if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). In applying that standard, “a court must view *341 the facts in the light most favorable to the nonmoving party and draw all inferences in that party’s favor.” Shuman, 422 F.3d at 146 (internal quotation omitted).
I.

Facts

On September 23, 2003, Lincoln General entered into an agency agreement with Northern Financial that permitted Northern Financial to sell Lincoln General’s commercial trucking insurance.[2] Under the agreement, Northern Financial was to inform Lincoln General of (1) insurance binders[3] it issued on behalf of Lincoln General and (2) premium financing transactions entered into in connection with Lincoln General policies. Northern Financial entered into an agreement with MacGregor whereby MacGregor would sell insurance on its behalf, and around February 2004, MacGregor began selling Lincoln General insurance for Northern Financial.[4] In exchange for selling the insurance, MacGregor received a ten percent commission on premiums generated by its sales.
MacGregor sold Lincoln General insurance to the Policyholders and AMGRO provided insurance premium financing for those transactions. Northern Financial issued insurance binders to the Policyholders and Lincoln General later issued the corresponding policies. MacGregor, as its agreement with Northern Financial provided, retained a ten percent commission on premiums generated by those sales.
AMGRO’s payments to MacGregor on behalf of the Policyholders were made through a Draft Authorization Agreement that permitted MacGregor to issue AMG-RO checks to itself to pay the Policyholders’ insurance premiums. Under normal circumstances, MacGregor would draft payment to itself from AMGRO, subtract its ten percent commission, and then forward the remaining premium payment to Northern Financial. Northern Financial would then forward payment to Lincoln General. This was not what happened, however. Somewhere along the way, the premium payments disappeared and Lincoln General never received them. As a result, Lincoln General cancelled all the Policyholders’ policies for non-payment of premiums.
After Lincoln General cancelled the policies, AMGRO sought a refund from Lincoln General for the premium payments it had made on behalf of the Policyholders. Lincoln General refused to refund any money to AMGRO because it never received the premium payments. This litigation ensued.

Procedural History

On February 1, 2006, AMGRO filed suit against Lincoln General for its refusal to refund the premium payments AMGRO made on behalf of the Policyholders. On August 23, 2006, Lincoln General filed a third-party complaint against Grossbard and MacGregor alleging (1) tortious inter *342 ference with contract, (2) unjust enrichment, and (3) civil conspiracy.[5]
AMGRO moved for summary judgment on its claim against Lincoln General for the premium payments. That motion was granted and Lincoln General was ordered to return the premium payments and pay AMGRO a statutory penalty. N.J. Stat. Ann. § 17:290-4.1 (providing statutory penalty where insurer retains unearned premiums). Grossbard and MacGregor also moved for summary judgment on Lincoln General’s claims of civil conspiracy against Grossbard, tortious interference with contract against MacGregor, and unjust enrichment against both Grossbard and MacGregor. The District Court entered summary judgment in favor of Grossbard on the civil conspiracy and unjust enrichment claims and in favor of MacGregor on the tortious interference with contract claim. It denied MacGre-gor’s motion for summary judgment on Lincoln General’s unjust enrichment claim. Shortly after the District Court decided the summary judgment motions, the parties entered into a Consent Order and Final Judgment (the “Consent Order”). In the Consent Order, the parties clarified the scope of their appeals and the amounts at stake in the litigation.
II.
Lincoln General appeals the statutory penalty awarded to AMGRO and the entry of summary judgment on its tortious interference with contract claim against MacGregor, and its unjust enrichment and civil conspiracy claims against Grossbard. MacGregor cross-appeals the denial of summary judgment on Lincoln General’s unjust enrichment claim against it. Each of these issues will be discussed in ten.
A.
Lincoln General’s first issue on appeal pertains to the statutory penalty awarded to AMGRO under N.J. Stat. Ann. § 17:29C-4.1.[6] The District Court held that *343 under New Jersey law, Lincoln General must pay a penalty of five percent “of the gross unearned premium,” computed on a monthly basis for each month or part thereof past the final date on which the refund was due. Id. The District Court also looked to N.J. Stat. Ann. § 17:16D-14(a)[7] for confirmation that New Jersey law places the obligation of returning unearned insurance premiums following a policy cancellation solely on the insurer.
Lincoln General raises three arguments against the statutory penalty: (1) that the two statutes, N.J. Stat. Ann. § 17:29C-4.1 and N.J. Stat. Ann. § 17:16D-14, do not apply to AMGRO, (2) that AMGRO is equitably estopped from receiving the statutory penalty, and (3) that AMGRO would be unjustly enriched by the statutory penalty because it was not damaged by Lincoln General’s failure to return the insurance premium payments. None of these arguments is availing.
1.
Lincoln General argues that N.J. Stat. Ann. § 17:290-4.1 is inapplicable because it only applies to premiums paid by the insured — not premiums paid by a premium financing company such as AMGRO. This argument fails. While the statute identifies “the insured” as the entity permitted to seek statutory penalties from the insurer, N.J. Stat. Ann. § 17:29C-4.1, an insurance “premium finance company [may] step[ ] in[to] the shoes of the insured for all payments and setoffs[.]” Sheeran v. Sitren, 168 N.J.Super. 402, 403 A.2d 53, 58 (NJ.Super. Ct. Law Div.1979); see also id. at 61 (stating that “unearned premiums ultimately belong to [the] insureds ... or those who stand in their shoes, such as [insurance premium] financing companies”). Here, AMGRO contracted for the right to “any and all unearned premiums ... which may become payable under the [Policyholders’] policies” in its financing agreements with the Policyholders. See, e.g., Qualified Transportation & Logistics Premium Finance Agreement ¶ 1 (assigning AMGRO “any and all unearned premiums”). Thus, AMGRO, standing in the shoes of the Policyholders, was properly permitted to seek the statutory penalty provided in N.J. Stat. Ann. § 17:290-4.1. Sheeran, 403 A.2d at 58; see also id. at 61.
According to Lincoln General, an interpretation of N.J. Stat. Ann. § 17:290-4.1 that permits insurance premium finance companies to seek statutory penalties under that statute renders N.J. Stat. Ann. § 17:16D-14(a) superfluous because those *344 companies could always seek relief under N.J. Stat. Ann. § 17:29C-4.1 as agents of the insured. This argument is beside the point. AMGRO’s ability to stand in the shoes of the Policyholders stems not from a statutory interpretation of N.J. Stat. Ann. § 17:290-4.1, but instead from the assignment of rights to the unearned premiums from the Policyholders to AMGRO. See Sheeran, 403 A.2d at 58; A.J. Armstrong Co. v. Janburt Embroidery Corp., 97 N.J.Super. 246, 234 A.2d 737, 743 (N.J.Super. Ct. Law Div.1967) (explaining that “under general principles of law of assignment, the assignee succeeds to all the rights of his assignor”); N.J. Higher Educ. Assistance Auth. v. Carlock, 247 N.J.Super. 471, 589 A.2d 671, 673 (N.J.Super. Ct. Law Div.1991) (same).[8]
2.
Lincoln General argues that AMG-RO should be equitably estopped from receiving statutory penalties because it enabled Northern Financial to carry out the insurance premium scam by failing to timely notify Lincoln General of its premium financing arrangements with the Policyholders and granting considerable authority to MacGregor to draft checks. According to Lincoln General’s brief, AMGRO “unjustifiably relied upon [Northern Financial] or failed to take the necessary precautions to avoid suffering from [Northern Financial’s] bad acts.” Thus, Lincoln General argues, AMGRO should be punished for its failure to “take the necessary precautions to avoid suffering damage as a result of the bad acts of another party of which it should [have] be[en] aware[.]”
The doctrine of equitable estoppel is “designed to prevent injustice[.]” Knorr v. Smeal, 178 N.J. 169, 836 A.2d 794, 799 (2003). Here, Lincoln General’s agent, Northern Financial, profited from its fraudulent scheme at the expense of Lincoln General and AMGRO. Indeed, most of Lincoln General’s accusations against AMGRO could also be leveled against itself. It, too, failed to sniff out Northern Financial’s fraudulent scheme. In fact, Lincoln General set the fraud in motion by permitting Northern Financial to act as its agent. Under these circumstances, in that AMGRO was duped by a fraudulent scheme, we cannot say that estopping AMGRO’s claim would prevent injustice. See id. Therefore, the doctrine of equitable estoppel is inapplicable.
Lincoln General also argues that it need not reimburse AMGRO for the commissions that MacGregor kept from the sales of insurance policies to the Policyholders. This argument fails for two reasons. First, Lincoln General waived this argument in the Consent Order. It agreed that it “w[ould] not appeal [the] part of the [District] Court’s Opinion and Order concerning [its] obligation to pay AMGRO the unearned premiums for the policies at issue[.]” Consent Order Background ¶ 5; see Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 222-23 (3d Cir.2000) (explaining waiver in the context of consent judgments). Lincoln General agreed to return the entire amount of the unearned premiums, not the unearned premiums less MacGregor’s commissions. *345 Second, even if this argument was not waived, the statute demands fall payment of “gross unearned premiums” by the insurer. N.J. Stat. Ann. § 17:29C-4.1.
3.
Lincoln General argues that the statutory penalty should not apply because AMGRO did not suffer damages from its failure to return the insurance premium payments. Awarding the statutory penalty, Lincoln General argues, would unjustly enrich AMGRO. The text of the statute belies Lincoln General’s assertion that AMGRO must produce evidence of damages to avail itself of the statutory penalty. N.J. Stat. Ann. § 17:290-4.1 (stating that “the insurer shall, as a penalty, ... return to the insured an additional amount equal to 5% of the gross unearned premium computed on a monthly basis for each month or part thereof past the final date on which the refund was due”) (emphasis added). The use of the word “shall” in a statute “normally creates an obligation impervious to judicial discretion,” Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (quoting Anderson v. Yungkau, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947)), and Lincoln General produces no compelling authority suggesting that this statute should be interpreted otherwise. Accordingly, Lincoln General’s argument fails because the plain meaning of the statute does not support its interpretation. Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). In sum, Lincoln General’s arguments against the statutory penalty award are unavailing and we conclude that the District Court properly awarded AMG-RO the statutory penalty.
B.
Lincoln General challenges the District Court’s entry of summary judgment for MacGregor on Lincoln General’s tor-tious interference with contract claim.[9] It asserts that MacGregor tortiously interfered with its contract with Northern Financial by issuing unauthorized temporary identification cards. According to Lincoln General, had MacGregor not issued those cards it would have quickly discovered that Northern Financial was not delivering insurance binders and premium payments to it in a timely fashion.
Lincoln General has not shown evidence that MacGregor interfered with its contract with Northern Financial. As the District Court explained, “[e]ven if MacGregor did[ ] as Lincoln General asserts[,] ... such conduct may constitute inappropriate or negligent business practices but it in no way ‘interfered’ with the contract between Northern Financial and Lincoln General.” Moreover, in effect, Lincoln General seeks to hold MacGregor responsible for Northern Financial’s nonpayment of premiums and for this reason, it must fail: “[T]he rule of tortious interference was not meant to upset the rales governing the contractual relationship itself.” Printing Mart-Morristown, 563 A.2d at 38. “Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law.” Id. Here, Lincoln General’s allegations are essentially based on Northern Financial’s non-payment of insurance premiums—an issue that is *346 “governed by the principles of contract law,” not tort law. Id. In other words, Northern Financial was “interfering] with the performance of [its] own contract” by engaging in its fraudulent scheme. Id. Even if MacGregor interfered with Lincoln General’s contract with Northern Financial, its actions do not rise to the intentional infliction of harm “without justification or excuse” needed to show malice. Velop, Inc., 693 A.2d at 926 (quoting Printing Mart-Morristown, 563 A.2d at 39). Accordingly, we agree with the District Court that Lincoln General’s tortious interference with contract claim cannot survive summary judgment.
C.
Lincoln General also appeals the District Court’s entry of summary judgment for Grossbard on its unjust enrichment claim against him.[10] It appears that Lincoln General is arguing that Grossbard was unjustly enriched both as an agent of Northern Financial and in his individual capacity. Under either theory, Lincoln General’s claim fails to survive summary judgment. First, to the extent that Lincoln General’s claim is based on Gross-bard’s actions as a Northern Financial officer, any such claim would be governed by the express contract between Northern Financial and Lincoln General. See C.B. Snyder Realty Co. v. Nat’l Newark & Essex Banking Co., 14 N.J. 146, 101 A.2d 544, 553 (1953); Moser v. Milner Hotels, Inc., 6 N.J. 278, 78 A.2d 393, 393 (1951); Winslow v. Corporate Express, Inc., 364 N.J.Super. 128, 834 A.2d 1037, 1046 (N.J.Super.Ct.App.Div.2003). “In light of this express contract, there is no basis ... for [Lincoln General] to pursue a ... claim for unjust enrichment.” Winslow, 834 A.2d at 1046. As for an unjust enrichment claim against Grossbard in his individual capacity, after examining the record, and in light of Lincoln General’s failure to identify evidence suggesting otherwise, we agree with the District Court’s determination that Grossbard received no benefit from Lincoln General. Grossbard cannot be held liable for unjust enrichment when he received no benefit. VRG Corp., 641 A.2d at 526. Thus, we agree with the District Court that summary judgment on this claim was proper.
D.
Lincoln General also appeals the District Court’s entry of summary judgment for Grossbard on its civil conspiracy claim.[11] This claim fails to survive summary judgment because Lincoln General never sets forth any evidence showing that Grossbard and Pisacane entered into an “agreement ... to inflict a wrong against ... another.” LoBiondo, 970 A.2d at 1029. “An unwitting party[, like Gross-bard,] may not be liable under a conspiracy theory.” Banco Popular N. Am. v. Gandi, 184 N.J. 161, 876 A.2d 253, 263 *347 (2005). Grossbard’s undisputed testimony shows that he had extremely limited interactions with Pisacane.[12] He had almost no knowledge of the day-to-day dealings between MacGregor and Northern Financial.[13] Thus, at best, Grossbard was an “unwitting party” to Northern Financial’s fraudulent scheme. See Banco Popular N. Am., 876 A.2d at 263. Lincoln General points to nothing in the record suggesting a conspiratorial agreement between Gross-bard and Pisacane. As such, we agree with the District Court that Lincoln General’s conspiracy claim against Grossbard cannot survive summary judgment.
E.
Having disposed of Lincoln General’s appeal, we now turn to MacGregor’s cross-appeal of the District Court’s denial of its motion for summary judgment on Lincoln General’s unjust enrichment claim against it. MacGregor argues that it lacked a direct relationship with Lincoln General and therefore could not have been unjustly enriched. See Callana v. Oakwood Park Homes Corp., 91 N.J.Super. 105, 219 A.2d 332, 335 (N.J.Super.Ct.App.Div.1966). But MacGregor’s own Statement of Undisputed Material Facts filed in support of its motion for summary judgment states otherwise:
• MacGregor contacted Lincoln General directly when Northern Financial “failed to respond to [its] efforts to procure the final policy [for a Policyholder.]” Statement of Undisputed Material Facts in Support of Mark Grossbard and Bancar Associates, Inc. d/b/a David MacGregor Company’s Motion for Summary Judgment ¶ 107.
• MacGregor and Lincoln General directly communicated to resolve discrepancies in insurance coverage created by Northern Financial’s actions. For example, on February 26, 2005, MacGregor wrote Lincoln General, outlining discrepancies in coverage between Northern Financial’s binders purporting to provide Lincoln General insurance and Lincoln General’s actual insurance policies. Id. ¶ 115. MacGregor asked Lincoln General to “honor the binders issued by [Northern Financial].” Id. “MacGregor [also] ... sent a number of subsequent letters to [Lincoln General] concerning problems with [Northern Financial].” Id. ¶ 117.
• Lincoln General directly contacted MacGregor to inform MacGregor that *348 it had not received premium payments from Northern Financial. Id. ¶ 12 1. MacGregor responded by sending Lincoln General copies of its checks to Northern Financial. Id. ¶ 122.
• Lincoln General notified MacGregor that it had cancelled several policies MacGregor procured for its clients through Northern Financial. Id. ¶ 123.
Given these facts, the relationship between Lincoln General and MacGregor was sufficient enough for the unjust enrichment claim against MacGregor to survive summary judgment. Unlike the plaintiff in Callano, Lincoln General repeatedly communicated with MacGregor and both parties recognized that they were in some form of business relationship. See Callano, 219 A.2d at 335. MacGregor expected the Lincoln General policies to be issued to its clients and Lincoln General expected to be paid for those policies. While both companies undoubtedly had relationships with Northern Financial, they also had a relationship with each other that could give rise to an objective expectation that MacGregor should return the commissions it earned in connection with Northern Financial’s fraud. See Insulation Contracting & Supply v. Kravco, 209 N.J.Super. 367, 507 A.2d 754, 760 (N.J.Super.Ct.App.Div.1986). MacGregor’s retention of commissions for sales of policies that were never delivered to the Policyholders could be viewed as the receipt of an unjust benefit. See Callano, 219 A.2d at 334 (“The key words are enrich and unjustly.”) (emphasis in original). Indeed, Lincoln General’s agreement to return all unearned premiums to AMGRO, Consent Order Background ¶ 5, makes MacGre-gor’s retention of the commissions seem unjust. The amount Lincoln General has agreed to pay includes the commissions that MacGregor has retained. In other words, the Consent Order requires Lincoln General to reimburse AMGRO for the cash that MacGregor is retaining as commissions for sales of insurance policies that were never delivered. Any recovery Lincoln General would receive from MacGre-gor would merely offset the amount that it must already pay AMGRO. As such, we agree with the District Court and conclude that denial of summary judgment on this claim was proper.
III.
Lincoln General has failed to show that the statutory penalty awarded to AMGRO was improper. Except for the unjust enrichment claim against MacGregor, Lincoln General has also failed to identify genuine issues of material fact that would permit its claims against Grossbard and MacGregor to survive summary judgment. For these reasons, we will affirm the District Court’s judgment.

. Wholesale insurance agents do not sell directly to the public. Instead, they use retail insurance brokers to communicate with insurance customers.

. Because we write only for the parties, we will concisely recount the facts.

. An insurance binder is a “temporary contract of insurance ... intended to give the applicant protection pending the execution and delivery of a formal written policy.” 16 Williston on Contracts § 49:53 (4th ed.2009).

.MacGregor and Northern Financial had entered into a "Producer Agreement” on October 11, 2002, approximately one year prior to the contract between Northern Financial and Lincoln General. That agreement permitted MacGregor to sell insurance on behalf of Northern Financial. MacGregor's sales of Lincoln General insurance were made under this agreement.

. Northern Financial and its CEO, Richard Pisacane, were also named as defendants in Lincoln General’s third-party complaint. Lincoln General charged Northern Financial with breach of contract and unjust enrichment and Pisacane with fraud, civil conspiracy, and unjust enrichment. On August 8, 2005, Lincoln General had filed a similar complaint in the United States District Court for the Middle District of Pennsylvania against Northern Financial, Pisacane, Gross-bard, and MacGregor. That complaint charged Northern Financial with breach of contract and Pisacane with fraud, civil conspiracy and unjust enrichment. On May 25, 2006, the United States District Court for the Middle District of Pennsylvania entered default judgments against Northern Financial on the breach of contract claim and Pisacane on the fraud claim. On July 14, 2006, the Middle District of Pennsylvania action was transferred to the District of New Jersey and consolidated with the case now before us.

. This section, entitled "Return of unearned premiums; penalty,” states:
Whenever an insurance policy or contract is canceled, the insurer on notice thereof shall return to the insured, within a reasonable time not to exceed 60 days of cancellation or notice, whichever occurs last, or 60 days after the completion of any payroll audit necessary to determine the amount of premium earned while the policy was in force, on a short rate basis the amount of gross unearned premiums paid; except for a policy or contract for private passenger automobile insurance, which amount of gross unearned premium shall be determined on a pro rata basis. In the event that the insurer fails to return the gross unearned premiums to the insured within the period provided for herein, the insurer shall, as a penalty, in addition to the gross unearned premium, return to the insured an additional amount equal to 5% of the gross unearned premium computed on a monthly basis for each month or part thereof past the final date on which the refund was due.
N.J. Stat. Ann. § 17:29C-4.1.

. This section, entitled "Application of unearned premiums,” states:
(a) Whenever a financed insurance contract is canceled, the insurer on notice of such financing shall return whatever gross unearned premiums are due under the insurance contract to the premium finance company for the account of the insured or insureds within a reasonable time, not to exceed 60 days after the effective date of cancellation, or 60 days after the completion of any payroll audit necessary to determine the amount of premium earned while the policy was in force. Such audit shall be performed within 30 days after the effective date of cancellation.
(b) In the event that the crediting of return premiums to the account of the insured results in a surplus over the amount due from the insured, the premium finance company shall refund such excess to the insured provided that no such refund shall be required if it amounts to less than $1.00.
(c)In the event that the premium finance company fails to return the amount due to the insured within the period designated, the company shall, as a penalty, in addition to the amount due to the insured, return to the insured an additional amount equal to 5% of the amount due to the insured computed on a monthly basis for each month or part thereof past the final date on which the refund was due.
N.J. Stat. Ann. § 17:16D-14.

. Lincoln General also argues that it did not receive the notice required under N.J. Stat. Ann. § 17:16D-14(a) for that statute to be invoked by AMGRO. But as the District Court correctly observed, there is no temporal limitation on when notice must be provided. N.J. Stat. Ann. § 17:16D-14(a) (providing that insurer "on notice of ... financing” must return unearned premiums to the premium finance company). Even if notice was not provided under N.J. Stat. Ann. § 17:16D-14(a), the import of that failure on AMGRO’s ability to seek statutory penalties under N.J. Stat. Ann. § 17:29C-4.1 is nil.

. A claim for tortious interference with contractual relationship requires "(1) the existence of the contract!)] (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages.” Velop, Inc. v. Kaplan, 301 N.J.Super. 32, 693 A.2d 917, 926 (N.J.Super.Ct.App.Div.1997) (citing Printing Mart-Morristown v. Sharp Elecs., 116 N.J. 739, 563 A.2d 31, 37-38 (1989)).

. "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.” VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 641 A.2d 519, 526 (1994). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.” Id.

. Civil conspiracy requires showing a "combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage.” LoBiondo v. Schwartz, 199 N.J. 62, 970 A.2d 1007, 1029 (2009) (internal quotation omitted).

. Grossbard testified during his deposition that he never had business dealings with Pisa-cane prior to Pisacane’s introduction to him by a colleague:
Q: Did you have any form of business relationship [before your colleague introduced you to Pisacane]?
A: No.
Q: Were you ever involved in any business dealings together—
A: No.
Grossbard interacted with Pisacane only "at the very beginning and veiy end” of the relationship between MacGregor and Northern Financial:
Q: Other than Rich Pisacane did you ever deal with anybody else at [Northern Financial]?
A: Well, I never really dealt with Rich except for at the very beginning and very end. In total, Grossbard interacted with Pisacane a handful of times and none of those interactions suggested a conspiratorial agreement between the two individuals.

. Grossbard testified as follows:
Q: Now, during the '03-'04 time period did MacGregor continue to underwrite business for [Northern Financial]?
A: From what I knew then or what I know now?
Q: What you knew then.
A: I didn't know very much then because I don’t get that involved in this aspect of the business.